## Case No. 2,267.

BYRD v. BYRD et al.

[2 Brock. 169.][1]

Circuit Court, D. Virginia. Nov. Term, 1824.

CONSTRUCTION OF WILL—SATISFACTION OF DEBTS AND LEGACIES—SPECIFIC LEGACIES.

1. W. B., by his last will, created, in the first instance, a separate fund, consisting of land, one hundred negroes, and other personal estate, for the payment of his debts, and then gave to his wife, for life, certain plantations, with all the remaining negroes, and stock of all sorts. He then directed that at the death of his wife, all his "estates whatsoever, consisting of land, negroes, stocks of all sorts, plate, books, and furniture, be sold as soon as convenient, and the money arising from the sale thereof be equally divided among all (his) children that are alive, &c." By a subsequent clause of the will, the testator, after devising certain lands to his son J., bequeathed to him "his choice of ten negroes, after (his) wife (had) chose such as she (pleased)" over and above his share of the money aforesaid. In like manner the testator proceeded to make specific bequests of slaves to several of his other children. The separate fund created for the payment of debts proving wholly inadequate for that purpose, the whole estate, real and personal, including the specific legacies of slaves, was sold by the executor, and after the payment of all the debts out of the general fund, a considerable sum remained to be distributed among the legatees. The question submitted to the court was: In what proportions should this residuum be distributed between the specific and general legatees of W. B.? The court held: That in the construction of a will, the whole of it must be taken together, and the intent of the testator collected from the entire instrument, without paying too much regard to the arrangement of the clauses. The general clause, bequeathing all the testator's remaining negroes, &c. to his wife, for life, and directing his whole estate, of every description whatever, to be sold at her death, and the proceeds to be equally distributed among his children, is clearly restrained by the subsequent clauses, giving specific legacies to some of them, as well that bequeathing a certain number, as those which designated the slaves by name. The will must be construed as if the clauses giving specific legacies had preceded the general clause providing for his wife, and the word "remaining," in that clause, must be understood as having reference as well to the specific legacy clauses, as to that creating a separate fund for the payment of debts. If, then, the sale of the negroes specifically bequeathed was not required for the payment of the testator's debts, the legatees were entitled to them respectively during the life of the widow, and if they were sold by the executor, not for the payment of debts, but under the general clause directing the sale of the whole estate, the proceeds of such sale represent the slaves themselves, and the specific legatees are entitled to them.

2. That so far as the specific legacies have been sold, and the proceeds applied to the payment of debts, the specific legatees have a right to resort to the general fund for remuneration, upon the principles which regulate courts in marshalling assets. That general fund being a mixed fund, composed of the proceeds, partly of personal, and partly of real estate, not chargeable with the payment of debts, the portion of it resulting from the sale of the personalty, is liable, in the first instance, to make good such specific legacies as have been sold for debts, and, if that be insufficient, the money arising from the sale of the real estate must be applied to the same object, so far, and so far only, as the specific legacies have been absorbed by specialty debts that bound the real estate.

3. That in the application of the principle that the real estate of the testator is liable to specific legatees to the extent of the specialty debts which have been satisfied out of the specific legacies, their title to the aid of a court of equity is only co-extensive with their equity. Therefore, where specific legacies have been sold, and out of the proceeds thereof many specialty debts have been paid off in a depreciated paper currency, the measure of reimbursement from the real estate ought to be, the whole actual loss of the personal estate, and not the mere nominal sum advanced by it.

4. That the value of the money advanced by the personal for the real estate, must be ascertained by the application of the scale of depreciation as fixed by law, on the day that the personal property was sold, and not at the time the debts were paid; that standard approximating, more nearly than any other, to the actual loss sustained by the personal estate.

5. That the interest allowed the personal estate for the sums advanced by it in discharge of specialty debts, should, in accordance both with the general course of the court, and with the justice of this particular case, be limited to twenty years

As to the rule for ascertaining the value of the ten slaves specifically bequeathed to J., but not designated by name, see the second opinion following [Case No. 2,268].

MARSHALL, Circuit Justice. This suit is brought for the distribution of the estate of

[1] [Reported by John W. Brockenbrough, Esq.]

William Byrd, deceased, among his legatees. The testator by his last will, created, in the first instance, a fund consisting of a tract of land, one hundred negroes, and other personal property, for the payment of his debts. He then gives to his wife, for life, the plantations of Westover and Buckland, with all the remaining negroes and stock of all sorts, and adds: "It is my will and desire that, at the death of my dearest wife, all my estates whatever, consisting of land, negroes, stocks of all sorts, plate, books, and furniture, be sold as soon as convenient, and the money arising from the sale thereof be equally divided among all my children that are alive at the time of my dear wife's death, deducting therefrom such sums as they may claim under the wills" of his mother and son William. The testator then enumerates advances he had made to several of his children, which are to be deducted from the amount of their respective portions, and also states contingencies on which the legacies of individuals are to be forfeited; after which he adds, "Should any of my children die before my wife, and leave lawful issue, the share of my deceased child shall go to them, and be equally divided.' 'I give to my son John, over and above what he will share of the money aforesaid, all my right to the mines in Fincastle, known by the name of Chiswell's mines, and two thousand acres of the land I claim under his majesty's proclamation of 1763. I likewise give to him his choice of ten negroes, after my wife has chose such as she pleases." The testator then devises to several sons, certain portions of the land surveyed for him under the proclamation of 1763, over and above their several shares of the fund directed to be distributed among them all, and to his daughters, in like manner, certain slaves by name. The whole estate, including the specific legacies of slaves, has been sold and the debts have all been paid; and there remains the sum of $28.645.45 to be distributed among the legatees. The specific legatees claim their legacies as a charge upon this joint fund, to be paid before the distribution directed by the will. This claim is resisted by the other legatees. It has been placed on two grounds: 1. The will of the testator. 2. On the principle of marshalling assets.

1. The will of the testator: In its construction, the whole is to be taken together, and the intent is to be collected from the entire instrument, without paying too much regard to the arrangement of the clauses. It is not denied that the testator intended the specific legacies as additional to the distributive share of each child, in the aggregate fund. He says so in express words; and there is no contrary opinion advanced in any part of the will. He supposed that the fund assigned for the payment of debts would be sufficient; and makes his will under that impression. Had the fact conformed to this opinion, and the whole estate, except that fund, had remained together, untouched by debts, it is not probable that this controversy ever could have arisen. It would scarcely be denied, that a bequest to his son John of ten slaves, over and above his equal share of his estate, was what it purported to be, and that those ten slaves were to be taken by John, in addition to his equal distributive share of the general funds. The mistake of the testator respecting the adequacy of the fund for the payment of debts, cannot change the construction of the will in this particular. His intention respecting his specific bequests remains the same; and though we may conjecture that he would have made some change in this respect, had he understood the true state of his affairs, no court can undertake to make the change for him. In adjusting the rights of the parties, then, this intent must be kept in view, and the inquiry is, how does it affect the fund now to be distributed? After setting apart one hundred slaves for the payment of his debts, the testator gives to his wife, Westover and Buckland, and all the remaining negroes, stock, &c., for her life, and directs that, at her death, his whole estate, of every description, shall be sold, and the money arising from the sale be equally divided among his children. This clause certainly requires an equal distribution of all the money arising from the property to be sold under it, and it becomes material to inquire what property it comprehends. The language is, that it comprehends his whole estate; and if these words are not clearly restrained by other parts of the will, the direction must be considered as extending to the whole. I think it perfectly clear that they are so restrained. The testator directs his whole estate to be sold at the death of his wife. This direction can operate only on property which shall at that time form a part of his estate. Property previously disposed of, cannot be the subject of this clause. Thus, he devises two thousand acres of his military land to his son John. The devise operates as a conveyance, and on the death of the devisor, vests the land in the devisee. It ceased to be a part of the estate of the testator, when that estate is to be sold, and, consequently, cannot be acted on by the clause under consideration. In like manner, the testator devises separate tracts of land to his sons, Thomas, Otway, and Charles. Upon his death, these lands cease to be a part of his estate, and vest in the devisees. To construe the clause directing the sale of his estate at the death of his wife, as extending to them, would be to annul these devises, and to set aside a large portion of the will. The same principle applies with equal force to the specific legacies. After the devise to his son Charles of one thousand acres of land in the county of Fincastle, the testator adds: "I likewise give him his man Tom, and little Jack White, and his choice of two negro girls, over and above his share of the money afore-

said." This bequest was obviously intended to take effect immediately. From the language of the will, Tom was, probably, at the time, in possession of the legatee. It is impossible to reconcile this bequest with an intention to sell these negroes, and to place the money in a common fund, out of which the legatee was afterwards to draw it. It is not their proceeds which he is to draw from the fund, over and above his equal share in it, but he is to have the negroes themselves, over and above that equal share. So with respect to the other specific legacies. It is perfectly clear that they are not to be sold, but are to pass specifically to the several legatees.

Between those legacies which express the names of the slaves which are given, and those which express only their number, leaving the choice to the legatee, there can be no difference, so far as respects this point. The intention of the testator to exempt them from the clause directing the sale of his estate, is equally clear. Indeed, in the expressions of the clause, giving ten slaves to his son John, there are some additional evidences of this intent. He shows that the selection is to be made by his son during the continuance of his wife's life-estate, and, consequently, anterior to the sale of his estate, since he restrains his son's right of choice, so far as to prevent its interfering with the choice of his wife. He gives to his wife "all the remaining negroes" for life, and yet he gives his son John his choice of ten slaves out of these remaining negroes; but in selecting them, he is not to interfere with the choice of his wife. The plain meaning is, that after setting apart the fund for the payment of debts, his son is to choose ten slaves; but if, in exercising this right, he should take any which his wife might be particularly anxious to retain, her choice should in such case be respected. It is perfectly clear, that the will is to be construed as if the clause giving all the remaining negroes to his wife for life, had been postponed to those which give specific legacies. The word "remaining" refers to all the clauses giving specific legacies, as well as to that which constitutes the fund for the payment of debts. This avoids the manifest repugnancy which would otherwise exist in these different bequests. Upon this construction, which gives effect to what, I think, was the obvious intent of the testator, the specific legacies are neither comprised in the bequest to his wife, nor in the clause directing the sale of his estate; and consequently, they compose no part of the fund which is to be equally divided among his children. So far as the intent of the testator can be carried into effect, the legatees were entitled, during the life of Mrs. Byrd, to their specific legacies; but the law interposes, and casts the whole personal estate upon the executor for the benefit of creditors. Their claims must be satisfied before any interest can vest in the legatees; but after the satisfaction of their claims, should any of the slaves specifically bequeathed, or their descendants, remain unsold, the legatees are unquestionably entitled to them. If they have been sold by the executor, not for the payment of debts, but under that clause of the will which directs the sale of the whole estate, the money must represent them, and remain the property of the person who was entitled to the slaves themselves. If it has been carried into the aggregate fund, it has been improperly placed there, and must be taken from it. If the slaves have been sold for the payment of debts, the rights of the parties must be governed by those principles which regulate courts in marshalling assets.

2. Have the legatees, whose specific legacies have been sold, and the money applied to the payment of debts, a right to demand satisfaction from the general fund? Had this fund been derived from the personal estate alone, as that estate was chargeable with debts in the first instance, and ought to have been exhausted before recourse was had to the specific legacies, the fund would unquestionably be liable in the first instance, to compensate the specific legatees for such of their legacies as had been sold for an object with which it was first chargeable. Had the fund been derived entirely from real estate, and that had been charged with the payment of debts, the same principle would have governed the case.[2] But had the real estate not been subjected to the payment of debts, either by the will of the testator, or by the law of the land, I know of no case which has gone so far as to subject it to the claim of legatees whose legacies have been taken by creditors. In this case, the testator has not subjected his real estate to the payment of debts. It is, therefore, liable no farther than for specialty debts, which bind the heir, and can be charged with legacies so far only as the personal estate has been applied in payment of debts for which the real estate was liable. Being a mixed fund, composed of the proceeds, partly of personal and partly of real estate, that portion of it which comes from the personal estate is liable, in the first instance, to make good such specific legacies as may have been sold for debts; and, if that be insufficient, the money arising from the sale of real estate must be applied to the same object, so far as debts by which the land was bound have been satisfied from the personal estate. A difficulty arises in adjusting the amount between the real and personal estate, from the fact which is alleged at the bar, that many of the specialty debts which have been discharged by the personal estate, have been paid off in paper money, and it is contended, that

---

[2] Clarke v. Buck, 1 Leigh, 487; Mollan v. Griffith, 3 Paige, 402; Haslewood v. Pope, 3 P. Wms. 323.

these, as between those parties, are advances made at the time of payment, which must be subjected to the scale of depreciation established by law. It is certainly true, that the legatees have no legal claim on the real estate, to be reimbursed moneys paid by the personal property in discharge of debts for which both were bound; and there is great reason in the position, that their title to the aid of a court of equity can be co-extensive only with their equity. But how far does this equity extend? The real estate is undoubtedly relieved to the extent of the debt from which it is discharged; and can make no just objection to retributing the personal estate to the extent of the injury that that estate has sustained; but I am not satisfied, that a principle which courts of equity have taken up solely for the protection of simple contract creditors and legatees, can be justifiably so applied as to enable those persons to make large profits out of the real estate. Admitting the real estate to be relieved to the amount of one thousand dollars, by the advance of five dollars from the personal, a court of equity might not interpose to restrain those entitled to the personal estate from asserting their claim to its extent; but I am not satisfied that a court of equity ought to interfere in aid of those persons beyond the sum actually advanced. But there is much difficulty in ascertaining what this sum is. The value of the money, on the day of its payment, is not, necessarily, the real amount of loss sustained by the person making the payment. The depreciation was continual, and as the gain of the real estate is the whole nominal sum, the reimbursement ought to be the whole actual loss of the personal estate. It will be extremely difficult to adjust this subject with any degree of certainty. If the parties can make any arrangement satisfactory to themselves, or state any account by which the necessary information can be given to the court, I shall be much disposed to apply the principle which has been stated to this part of the case.

Having determined that the legatees who claim under the will of the testator a certain number of slaves not named by him, but to be shown by themselves, and it being stated that these legacies are unsatisfied, it remains to determine how they are now to be satisfied. If, after the payment of debts, there were negroes remaining in the estate not given by name, they would be liable to these legacies, if the legatees chose to take them; if there were no such slaves remaining, then the value of the legacies must be determined on some equitable principle.

Decree: This cause came on to be heard, &c., on consideration whereof this court is of opinion that the specific legacies given in the will of the late William Byrd, are not comprehended in the clause which gives the remainder of his slaves to his wife for life, nor in that which directs sale of all his estate at her death; but were intended to pass immediately to the legatees, and might be claimed by them as soon as the condition of the estate, with respect to creditors, would justify the executrix in paying legacies. If, therefore, after the payment of debts, any slaves bequeathed by name in the will, or their descendants, remained in the possession of the personal representative of William Byrd, the person to whom the same were bequeathed, or his or her representative, would be entitled to demand them; and if they have been sold, and the proceeds are not required for the payment of debts, such person is entitled to the money arising from the sale. And the court is further of opinion, that the representative of John Byrd, to whom ten slaves were given, to be chosen by himself, and of Charles Byrd, to whom two girls were given, to be chosen by himself, those legatees or their representatives might exercise the right of choice given in the will, if the condition of the estate, after the payment of debts, would admit of it; and if such slaves have been sold, then they are entitled to the money arising from the number which they respectively claim, with interest from the expiration of the credit given at the sale; but if the number to be chosen did not remain unsold when the debts were discharged, so that these legacies cannot be satisfied by receiving the slaves themselves, then they ought to be satisfied out of the residuary fund, so far as the principles hereinafter stated will allow them to resort to it. That portion of the fund which arises from the personal estate, is liable, in the first instance, to the payment of the specific legacies which have been sold for the payment of debts; and if this shall prove insufficient, an account must be taken of the personal estate which has been applied to the payment of debts that bound the land, and the fund arising from the real estate must be charged to the amount so paid by the personal estate. If in taking this account, it shall appear that specialties binding the land have been paid by the personal estate in paper money, and it can be shown what the real value of such paper money was to the personal estate, the real estate ought to be charged only to the extent of that value.

[NOTE. The accounts were referred to a commissioner. For the opinion on questions arising out of the commissioner's report, see next following case, No. 2,268.]