R. D. WHITLEY, Guardian, &c., and others v. A. A. ALEXANDER, Adm'r., &c., and others.

An administrator, whose wife was the only heir and next of kin of the intestate, took into possession in October, 1861, all the property of the intestate, and used it as his own, including a number of slaves, employed by the administrator in cultivating his land; which property was more than sufficient to pay the debts of the intestate, and some of which the administrator sold and paid off before 1863, a large amount of the intestate's indebtedness including debts of simple contract, and before notice of two of the debts sued on; and who administered the same bona fides: Held, that as the debts the administrator had notice of, was small in comparison with the estate, he might reasonably expected to have paid them from the income of the estate of the intestate, without making the sacrifice which would have resulted from a sale of the slaves after 1861, and that the administrator was not, under the circumstances, liable for the value of the slaves.

Nor was the administrator, under such circumstances, liable for the value of three mules taken by the Confederate authorities, one of which was paid for with Confederate money, which, the administrator being unable to use, he invested in Confederate bonds and lost.

An administrator, who finds a raw commodity on hand, (tobacco for instance,) may lawfully, without a fraudulent intent, put it in a condition in which it is usual to sell it, or in which, under the circumstances, it can be best sold. And the administrator was justified, on account of the perishable nature of the tobacco, in selling it for Confederate money, the then only currency.

Where the administrator rightfully and bona fide receives Confederate money, in the administration of his intestate's estate, which cannot be used in the payment of debts, and the money not being by him in any manner converted, he ought not to be charged with value thereof.

Where an administrator had certain railroad stock belonging to his intestate, assigned to himself personally and for his own benefit: Held, to be a conversion of such stock, for which the administrator was responsible.

When an administrator has paid debts of lower, before those of higher dignity, the estate being at the time solvent, or when any creditor has refused to receive payment in Confederate money, which was afterwards used in payment of the debts of the estate, or become worth-

WHITLEY, Guardian, &c , et al. v. ALEXANDER, Adm'r., &c. et al.

less without the fault of the administrator: *Held*, that such payment should be allowed to the administrator in all suits, &c., without regard to the dignity of the debts thus paid, as compared with those sued for.

If an intestate owe simple contract debts which are due, and he is also indebted by a contingent security, such as a bond to save harmless, or other bond, under which it depends upon a contingency whether any debt will ever arise, and no breach of the condition has taken place, the administrator may pay the simple contract debt.

A judgment *quando* amounts to an admission that the administrator had no assets at its date; and an order of reference subsequently made, should confine the account to the assets received by the administrator since the date of the judgment.

This was a CIVIL ACTION on a guardian bond, tried before his Honor, Jude *Schenck*, at Spring Term, 1875, of MECKLENBURG Superior Court, on exceptions by plaintiffs and defendants to the report of the Clerk, to whom it had been referred to take certain accounts.

The statement of the case for this Court, made up by the counsel of the parties in the Court below, is so complicated, that, to a proper understanding of the questions intended to be raised and presented for the decision of this Court, it is deemed best to publish the same without alteration or abridgement; and that too, although the record sets out many facts not pertinent to the points decided.

The statement is substantially as follows:

In the Superior Court for the county of Mecklenburg four suits were instituted by the hereinafter mentioned plaintiffs, against the defendant A. A. Alexander, administrator of the estate of R. B. Monteith, hereinafter named upon the following causes of action as hereinafter set forth.

I. At Fall Term, 1870, a summons was issued and served upon A. A. Alexander, W. S. M. Davidson and Nathaniel Alexander, at the instance of F. M. Parks and wife Sarah A., Mattie J. Alexander and infants John McAlexander, A. W. Alexander, Laura R. Alexander, who sue by their guardian,

J. B. Kernes; in which case a complaint was filed setting forth the following cause of action, to-wit: That one John McAlexander, died intestate, in the year 1856, and leaving among others as his next of kin who were infants at that time, Mattie J. Alexander, John McAlexander, Albert Alexander and Laura Alexander; that at the January Term, 1861, of the Court of Common Pleas and Quarter Sessions for said county, one B. W. Alexander entered in as guardian for said minor children, and gave bond as required by law in the sum of twenty thousand dollars, with R. B. Monteith, the intestate of the defendant, A. A. Alexander, as surety. That by virtue of his appointment as guardian, the said B. W. Alexander took charge of the estate of his said wards; that said B. W. Alexander died in the year 1865, without having made a settlement of his guardian estate, that at October Term, 1866, one James D. Kerns qualified as guardian of the three minor children of the said John McAlexander, to-wit: John McLaura R. and A. W. Alexander; the plaintiff Sarah having intermarried with one T. M. Parks; that in 1866, a suit was instituted by the guardian of the infants aforesaid, and Parks and wife against the personal representation of the said B. W. Alexander, when it was adjudged that the said B. W. Alexander was indebted to his wards in the following sums respectively:

| T. A. Alexander, | $2,090.43 |
| W. J. Alexander, | 2,837.81 |
| J. M. Alexander, | 3,788.06 |
| A. W. Alexander, | 3,852.59 |
| L. Alexander, | 3,865.60 |

Making a total indebtedness of          $16,434.49

And this suit is brought upon the guardian bond of the said B. W. Alexander, upon which Monteith, the intestate of the defendant, A. A. Alexander, is surety to recover the same.

II. The second suit was brought in the name of T. M. Parks and wife Sarah Ann, Mattie J. Alexander of full age, and John McAlexander, A. W. Alexander and Laura A. Alex-

ander, who sue by their guardian, J. D. Kernes, against A. A. Alexander, W. S. M. Davidson and Nathaniel Alexander infants. The cause of action is as follows :

After setting out the fact in the complaint of the death of John McAlexander and the appointment of B. W. Alexander, the guardian of his infant children, the death of B. W. Alexander, the appointment of an administrator upon his estate, the appointment of T. D. Kernes as guardian of the three minor children as aforesaid, the complaint alleges that in the settlement of Kernes, guardian with the personal representatives of said B. W. Alexander, the said Kernes as guardian, took from said personal representative a note upon R. B. Monteith as principal in the sum of $1,272.79, and that Kernes instituted a suit in Mecklenburg Superior Court in the name of the personal representative of B. W. Alexander against A. A. Alexander, administrator of R. B. Monteith, and on the 22nd of November, 1869, recovered a judgment *quando* against him for said sum with interest and costs, and this suit is brought to recover this amount upon the administration bond of said A. A. Alexander.

III. The third suit was brought by Moses A. White, guardian of the minor children of J. H. Johnston against A. A. Alexander, administrator of R. B. Monteith upon the following cause of action, to-wit : Upon a promissory note given by R. B. Monteith to said Johnston, guardian, in the sum of $480.00 upon which there was a payment of $150.00.

IV. The fourth suit is brought upon the guardian bond of B. W. Alexander as guardian of Harriett McCoy upon the relation of Albert McCay and R. D. Whitley, guardians of said Harriett McCay against S. P. Alexander, administrator of B. W. Alexander, and A. A. Alexander, administrator of R. B. Monteith, the said Monteith being the surety to said B. W. Alexander, to recover the sum of four thousand dollars, the amount of said bond.

That this case was referred to E. A. Osborne, Clerk, to take an account of the administration of R. B. Monteith by

A. A. Alexander, administrator, and it was agreed by the counsel engaged that all the testimony and the report of the Clerk should apply to the four cases aforesaid. That in accordance with said agreement such testimony was taken relative to the points made in all four of the cases, and a report made by the Clerk and returned to the Court fixing the administration with assets. That when the case came on for hearing before his Honor, Judge Schenck, upon exceptions filed thereto, his Honor filed his decree, finding the facts and the law relative thereto : That upon filing said decision the counsel for the defendant proposed certain issues of fact which they deemed necessary for a decision of all the matters arising in the four cases aforesaid. Four of which said issues his Honor did pass upon ; the others of which he declined so to do. There was evidence taken in the case pertinent to the issues not found by his Honor, as will appear by the depositions on file in this cause ; that the said issues of fact which the counsel for the defendant requested his Honor to find together with those not found, have been filed in this cause, and compose a part of the record in this case.

Upon the foregoing case being tendered to the plaintiff's counsel as an addition to the case heretofore filed in the Supreme Court, they agree to accept the same with the modification and addition following, which is agreed to by the defendant's counsel, to-wit :

Subsequently to the reference to the Clerk to take the account referred to, by an order of the Court, it was referred to the Clerk to report the facts which report was made by the Clerk and exceptions filed thereto by the counsel for the defendants, when the cause came on for hearing before SCHENCK, Judge, defendant's counsel made a motion to set aside the report of the Clerk finding the facts, whereupon his Honor proceeded to find the facts himself to which plaintiff excepted.

By leave of Court plaintiffs filed exception No. 4. This additional fact is agreed upon by the counsel as a part of the case. That at the time Alexander administered on the estate

of Monteith, he regarded the estate as solvent, and as Alex-der's wife was the only heir at law, and next of kin to Monteith, he kept the property together, thinking he could make the money out of it to pay the debt of Monteith's estate, and he kept the property there until the close of the war.

The following is the report of the Clerk, viz:

This cause having been referred to the undersigned to report the facts, I find as follows: A. A. Alexander administered on the estate of R. B. Monteith, at October Term of the County Court, 1861, and gave bond with defendant, W. S. M. Davidson and N. S. Alexander for forty thousand dollars. The property of the estate consisted of a large quantity of lands, embracing eleven plantations of various sizes and value, sixteen negro slaves, valued at from $500 to $1,500 each; twenty thousand pounds of leaf tobacco, valued at $2,400; eleven mules, worth $1,600; twenty-five shares of railroad stock valued at $1,440; fifteen bushels corn, valued at $22.50, and various other items of property as set forth in the report heretofore filed in this action, amounting in all to $37,504.34, principal, and $15,077.30 interest, $52.581,64. Of this amount the administrator only returned to the Court a report of $3,161.32 (principal) worth of assets since the action began, which was mainly the proceeds of a sale made soon after the death of Monteith. All the other property was taken into the possession of the administrator, whose wife was the only heir and next of kin to said deceased, and used by him as his own property. The tobacco was manufactured and sold with some of Alexander's own tobacco. The greater portion of the corn and forage was used for the mules and negroes, and they were kept and worked on the farms. Some of the mules, one or two, were taken by Confederate authorities, some by raiders, and perhaps one sold in the sale of assets before mentioned. In fact, all the property not sold as above stated, was taken in the possession of defendant, and used as his own property. In the mean time, the administrator paid off a great many debts, amounting in the

29

aggregate to very much more than the sum of assets reported by him, say $10,000 or $15,000. All the negroes were set free, and the administrator sold all the lands under an order of the Court, in order to raise more funds to pay the numerous claims that were presented against the estate, and the proceeds also were applied to the payment of such debts; until finally, according to his vouchers filed, he has paid out in all $9,883.62 principal money. The Clerk in his account, has charged the administrator with the estimated value of the slaves, stock and all unsold personal property, allowed him full commissions on all assets and payments, and the result shows the administrator still liable for a balance of $27,549.72. The defendant was charged interest on all money and assets from the time he re ceived them, and allowed interest on all his disbursements from the time made. The eleven mules are not charged in the sale list, nor were they sold at the sale. The vouchers named in exception VI, were rejected by the Clerk on the ground that there were debts of higher dignity unpaid outstanding against the estate. The Confederate bonds and money, (Exception VII,) were not the proceeds of any lawful sale of the estate, but only such as arose from the private arrangement and management of the estate as Alexander's own property. The testimony before the Clerk is all on file in the case. The railroad stock referred to in exception, was subscribed for in the name of intestate, and stood on the books in his name, and were changed to the name of defendant after his, Montieth's death. The defendant's return shows a voucher from the treasurer for $550, in full of the balance on the subscription for the 22 shares from M. L. Wriston, treasurer, and has received credit therefor in his account.

Respectfully submitted,

E. A. OSBORNE,
*Clerk Superior Court.*


To this report both plaintiffs and defendants excepted.

WHITLEY, Guardian, &c., *et al* v. ALEXANDER, Adm'r., &c., *et at.*

The plaintiffs except to the report of the Clerk and for cause of exception show :

1. That it appears from the testimony that the defendant received the hire and profits of the slaves belonging to his intestate from the date of his administration in October, 1861, up to their emancipation, yet the clerk does not debit him with value of such hires.

GUION, VANCE & DOWD,

Attorneys for plaintiffs.

Defendants except to the report of the clerk under the reference to him by the Court to ascertain and report the facts as proved by the testimony on file in the foregoing particulars :

1st. That said report is vague and uncertain.

2d. That it fails to report the facts as to the third exception of the defendants in this,

I. That it appears in testimony on file that the estate of defendant's intestate was regarded as solvent up to the close of the war.

II. That it is in evidence that defendant had no knowledge of the extent of the liabilities of his intestate until after the war, and particularly as to liability of his intestate as surety to B. W. Alexander, or the extent thereof until some time after the cease of the war, to-wit, in 1866.

III. That said B. W. Alexander was reputed solvent till the time of his death as shown by the testimony on file.

IV. That it is in evidence that the defendant kept the negroes and other personal property on the land of his intestate, believing the intestate to be entirely solvent and not knowing of the extent of the liabilities of his intestate.

3rd. That as to the 4th exception the referee has failed to report the fact shown in testimony that three of the mules of which defendant is charged in the clerk's former report were impressed by the Confederate authorities ; for two of which he received nothing, and the third was paid for in Confederate

money, that the defendant is charged with eleven mules, when the testimony shows he had only ten.

4th. That as to the fifth exception of defendant as to the charge of A. T. & O. R. R. stock the testimony shows that said stock was subscribed for by defendant's intestate and was paid for by defendant after the death of his intestate, and it is further in evidence that said subscription of stock was of no value, which facts are not reported by the referee.

5th. That as to exception 6th the referee has failed to report the fact that at the time the vouchers for disbursements by the defendant as administrator which he has rejected were paid, when defendant believed the estate to be solvent, and when he did not know of any liabilities of his intestate as sureties for others as appears in evidence, nor does he report the evidence as to the nature of the dignity of the debts paid or those outstanding against the estate.

6th. That the referee has failed to report the facts as shown in evidence on file as to defendant's receipts and investments in Confederate money.

7th. That he has failed to show the testimony as to the 9th exception of the defendant wherein he is charged with the value of the wheat, corn, oats and tobacco as set forth in the evidence.

And defendant's counsel request the Court to pass upon the following issues of fact, which they deem material to a correct decision of the several causes to which the report, exceptions and testimony on file are applicable:

I. What were the alleged causes of action in the case of Parks and wife against the defendant?

II. At what time did the defendant, Alexander, receive notice of the liability of his intestate as surety upon the guardian bond of B. W. Alexander, guardian of Junius W. Alexander's children? Answer: In 1866.

III. What were the alleged causes of action in the case of M. A. White, guardian against the defendant, Alexander?

IV. When did the defendant, Alexander, receive notice of

the existence of the debt of M. A. White, guardian ? Answer: In 1862.

V. When did the defendant, Alexander, receive notice of the existence of the debt due B. W. Alexander, guardian, by his intestate? Answer : In 1862.

VI. During what years were the debts paid for which the rejected vouchers were taken ?

VII. Were the Confederate securities purchased with the proceeds of other property than the tobacco sold in 1863 ? If so, the proceeds of what property and to what amount ?

VIII. Could the leaf tobacco have been sold to advantage in this locality at any time after defendant Alexander qualified as administrator ? Answer : It could have been sold for good money.

IX. Was there any means of transportation for this tobacco to the nearest tobacco market? Answer : There was, to the market in Charlotte where tobacco was bought and sold.

X. What was the condition of the tobacco at the time Alexander qualified as administrator ? Answer : It was in leaf.

XI. Was it necessary to purchase supplies and machinery for the purpose of manufacturing the tobacco, and did the defendant Alexander mingle this tobacco with any other tobacco than used for wrappers ? Answer : It could have been sold for good money without wrappers, but the defendant in good faith manufactured it and made it more valuable, but sold it for Confederate money after he had notice that some of the creditors would not receive it, and without consulting the others whether they would have received it or not.

The above papers was filed after the decree of the Court was rendered and filed.

After argument, his Honor made the following decree, to wit :

(The defendants withdraw exceptions one and 2.) As to exception 3 ;

The Court finds that the defendants' intestate, Monteith, died in 186—, and that the defendant, Alexander, administered on

his estate in October, 1861, taking the personal property, including the slaves, into possession. That the intestate's estate was amply sufficient to pay his own debts ; and that the debt in this case was contracted as surety for B. W. Alexander. That the defendant, Alexander's wife, was sole heir and next of kin to said intestate.

That B. W. Alexander's estate was amply sufficient to pay all his debts in 1861 ; and was only rendered insolvent by the results of the war.

That the defendant had no notice of his intestate's liability for this debt until 1866, and after the slaves had been emancipated.

That the defendant, Alexander, as administrator, held on to the said slaves in good faith, supposing that they would not be required to be sold for the purpose of paying the debts of the intestate ; and that the said slaves were emancipated before he had notice of B. W. Alexander's insolvency and the consequent liability of his intestate estate. The Court, therefore, sustained the (3d) exception.

But as the defendant had the use of the negroes, (as the Court finds,) from 1861 to the time of their emancipation, the Court holds that he is responsible for the net value of their hires, that is, their yearly value, subject to be set off for taking care of them, Doctor's bills, and other necessary expenses.

Exception No. 1 of the plaintiffs is therefore sustained ; and the Clerk is directed to reform the report accordingly.

As to exception 4 of defendant ;

The Court finds that there were eleven mules on hand at the death of the intestate, Monteith, and that the administrator took them into his possession ; that two of these mules were impressed in 1862 or 1863, and one in the latter part of the year 1863 ; that those mules would have sold for good money in 1861 and 1862, for $——.

That the defendant had notice of individual debts of the intestate, Monteith, to the amount of several thousand dollars

in 1861 and 1862; and that the defendant, as administrator, did not sell but one half of said mules.

The Court further finds, that to pay these individual debts, it was necessary to sell the loose and perishable property ; and therefore, the Court holds the defendant responsible for the value of the ten mules and the price of the one sold, and directs the report to be modified accordingly.

As to exception 5 of defendant,

The Court finds that the intestate had subscribed for twenty-two (22) shares of stock, and that the defendant, as administrator, paid for eleven (11) of them in 1862; the other eleven (11) were paid for by the intestate. The Court therefore holds that the defendant is chargeable with the value of the eleven shares in 1861; and the interest and the value of the eleven shares in 1862, when he paid for them with a credit of the $566, which he paid for them, deducted. That the other four shares mentioned, the intestate bought and gave his note for, which the defendant discharged as administrator. The Court also holds that he is chargeable with the value of these shares in 1861.

As to exception 6 of defendants:

The Court finds that these vouchers were paid on debts of less dignity than the plaintiffs' ; and the testimony does not show that he paid them without notice of plaintiffs' debt, which was of higher dignity. The exception is therefore overruled.

As to exception 7 of defendants ;

The Court finds that there was a lot of tobacco on hand, amounting to about 20,000 pounds, which the defendant had manufactured—mixing it with some of his own, which he used for wrappers ; that a portion of this, about 5,000 pounds or 6,000 pounds, was sold at private sale in 1862, by defendant, and as far as possible, used in the payment of debts for which he has credit.

That in the latter part of 1862, the defendant tendered Confederate money to several of the creditors of the intestate, and they refused to receive the same ; that notwithstanding this

notice of its depreciation, the defendant in February, 1863, sold the balance of the tobacco at private sale for Confederate money, which become worthless on his hands, and he bonded it, as he swears, in Confederate bonds.

The Court therefore declined to sustain the 7th exception, as the credit therein claimed, is the proceeds of the tobacco sold in 1863.

Exceptions 8, 9 and 10 were withdrawn.

It is ordered by the Court, that the report be re-committed to the Clerk to be modified according to the above rulings.

From the above rulings of his Honor, and his refusal to submit certain issues to the jury, as hereinbefore stated, the defendants appealed.

*Wilson & Son* and *Jones & Johnston*, for appellants.
*Barringer* and *Vance & Dowd* and *Shipp & Bailey*, contra.

RODMAN, J. After some discussion, it was agreed by counsel that there was no material difference between the facts as found by the referee, and by the Judge on review. It is therefore unnecessary to consider whether the Judge had the right to review the finding of facts by the referee.

The case has been complicated by the agreement of the parties, by which several actions to which different defences are made, and rules somewhat different may apply, are united in one record. We will consider the exceptions to the report as to the assets in the hands of the defendant, A. A. Alexander, as administrator of Montieth, and the parties will be able, when they move for judgment in their respective cases, to apply so much of this opinion as relates to the particular case of each. If, on the motions for judgment, new questions shall occur not presented to us on these appeals, they must be decided in the Court below, to which the case will be remanded for further proceedings.

In order that our observations on the several exceptions may be intelligible, it is necessary to describe as briefly as possible,

the several actions against the defendant, A. A. Alexander, as administrator of Montieth, in which the account before us was taken. There are four suits :

I. *F. M. Parks and others, plaintiffs,* v. *A. A. Alexander, as administrator of Monteith and others, defendants.* Brought on bond given in January, 1861, by B. W. Alexander as guardian of certain minors, to which Monteith was surety. The indebtedness of the guardian to his wards has been determined in an action against the administrator of the guardian at $16,434.49.

II. *Parks and wife and others, plaintiffs,* v. *A. A. Alexander and others, defendants.* Brought on bond given by A. A. Alexander, as administrator of Monteith ; the breach alleged, being the non-payment of a note for $1,272.79. given by Monteith, to ——.

III. *White, guardian of minor children of Johnson, plaintiff,* v. *A. A. Alexander, administrator of Monteith,* on note of Monteith for $480, (subject to a credit) given to Johnson.

IV. *On relation of McKay and Whitly, guardians of Harriet McKay, plaintiffs,* v. *A. A. Alexander, as administrator of Monteith.* This action is brought on a guardian bond given by B. W. Alexander, to which Monteith was a surety.

I. *Should the administrator be charged with the value of the slaves of his intestate ?* The defendant, A. A. Alexander, administered on the estate of Monteith in October, 1861. The estate was large, consisting of eleven plantations, sixteen slaves, twenty-five shares of railroad stock, valued at $1,440, twenty thousand pounds of leaf tobacco, eleven mules, and other articles of personal property. The wife of the administrator was the only heir and next of kin of the intestate. The administrator took possession of all the property and used it as his own. He employed the slaves in cultivating the lands until their emancipation. He sold a part or the whole of the unnamed personal property, and paid off a large amount of debts of the intestate, some of which were debts by simple contract ;

these payments were made before 1863, and before notice of debts No. 1 and No. 4, above mentioned, but with notice of debts No. 2 and No. 3. B. W. Alexander died in 1865. He was solvent in 1861, and so continued until after the war, when he became insolvent. It does not appear that A. A. Alexander ever advertised for the creditors of Monteith to present their claims.

These are the main circumstances affecting his liability for the value of the slaves. His *bona fides* in the administration of the estate is not questioned, and indeed it could not well be, as his wife was entitled to all of it that could be saved after the payment of the debts. His interest in a prudent management of it lay on the same side with his duty as administrator, and every reasonable inference in his favor must be drawn from this union. The debts which he had notice of were small, compared with the estate. He might reasonably have expected to pay them from the income of the estate, without making the sacrifice which would have resulted from a sale of the negroes at any time after the close of 1861; for we know as matter of history, that after that time the price of slaves, at least in most parts of the country, depreciated even more rapidly than Confederate money did. Moreover, a sale could only have been made for Confederate money, which the only two unpaid creditors of whose debts he had notice refused to receive. Under these circumstances, we are of opinion that he is not liable for the value of the slaves. As the thing turned out, it might have been better to have sold them even for Confederate money, provided that the money had been invested in gold, or land, or other property that could have been saved. But this is evidently a false mode of reasoning. It expects a prescript of distant and uncertain events. No greater degree of foresight and prudence can be required of an administrator than was used by the slave owners of the State in general; yet probably not one in a thousand of these sold his slaves during the war.

II. The administrator is charged with the profits of the

slaves until their emancipation, and as there is no exception, either to this charge or to the manner of ascertaining the amount of it, we need say nothing on that subject.

III. *The mules.* Three of these it seems were taken by the Confederate army. It was admitted that one of them was paid for in Confederate money, which was either kept on hand or invested in Confederate bonds, and in either way, lost. For the same reasons which have governed us with respect to the slaves, we hold that the administrator, was not in default in keeping these mules at work on the farms. He is liable for the value of the eight, of whom no account is given. But he is not liable for the three taken from him by irresistible force.

IV. *The twenty thousands pounds of tobacco.* It is agreed that by manufacturing this, using his individual tobacco for wrappers, the administrator converted it; and also upon the doctrine of confusion of goods, that his individual tobacco so used, become his property as administrator, and liable to the creditors of his intestate. No doubt in the case of a trespasser, such use of the tobacco would have been a conversion. But an administrator who finds a raw commodity on hand, may lawfully put it into the condition in which it is usual to sell it, or in which, under the circumstances, it can be best sold. Thus he may gin the seed cotton, shell the corn, or thrash the wheat, &c. The doctrine of confusion of goods does not apply. There was here no fraudulent intent, and no injury to the goods of the intestate, which although they could not be separated in fact, yet were easily separable in value.

W are of opinion, also, that on account of the perishable nature of tobacco, the administrator was not required to keep it in specie, but was justified in selling it for Confederate money, which was then the only currency.

V. *Confederate money.* The only sources indicated in the report of the referee, or by the Judge, from which the sum found on hand in this money was received, are the impressed mules, the tobacco, and the sale of unnamed articles soon after administering. If more was received it would seem to have

been paid out on debts. As the receipt was justifiable on these receivers, and no use could be made of the money in paying debts, by reason of the refusal of two of the creditors to receive it, and the contingent character of the two other debts which, in fact, were not known to the administrator to exist, and as the money was not converted by him to his own use, he ought not to be charged with it.

VI. *As to the shares of railroad stock.* As the administrator had these assigned to himself personally for his own benefit, and not for that of the estate, he converted them, and is liable for their value at the time of the conversion in the state in which they were, that is, to say subject to the payment of the unpaid balance of the subscription.

VII. *Rejected vouchers.* The administrator offered to the referee evidence of the payment by him of a considerable number and amount of debts owing by his intestate, which the referee rejected, on the ground that they were simple contract debts, and were paid after notice of debts of higher dignity. The amount of the vouchers so rejected is not anywhere stated, nor the dates of payment. It is agreed, however, that the payments were made before the close of 1863, and that the specialty debts of which the administrator had notice, were those numbered two and three above, being on the notes of Monteith for $1,272.79, and for $480.00. It does not appear whether or not the payments relied on were made in Confederate money, although from their dates, we must assume that they were. It is admitted that the creditors in these debts refused to receive Confederate money in payment. It does not appear, however, when it was tendered to them, or even whether it was before or after the payment of the simple contract debts. Perhaps it is not material. The act of 1869–'70, chap. 150, enacts in substance, that when an administrator has paid debts of lower, before those of higher dignity, the estate being at the time solvent; or when any creditor has refused to accept payment in Confederate currency, which was afterwards used in payment of the debts of the es-

tate, or became worthless without fault in the administrator; such payments shall be allowed to the administrator in all suits, &c., without regard to the dignity of the debts thus paid, as compared with that sued for. The learned counsel for the defendant did not cite this act, perhaps because it merely expressed a rule, which was a principle of equity before its enactment. However that may be, we consider that the act applies. The administrator had Confederate money legitimately received, and the creditors in question refused to receive it, as they had a right to do. How were those creditors ignored, by the administrator applying it to pay other debts inferior to theirs? The estate was relieved to the extent of the payment, and the security of the specialty creditors not diminished. Under ordinary circumstances the payment would have been a *devastavit* But the circumstances during the war were extional, and justice can only be done by applying to them the broad principles of equity.

These creditors, by refusing to receive payment in the only existing currency, took their chances that the estate would withstand the accidents of the war. The administrator, although he was bound to fidelity and diligence, did not become their insurer, and we think he is entitled to credit for the payments in question, as against these creditors.

The question as to whether he is entitled to credit against the creditors Nos. 1 and 2, (that is as to the creditors upon the guardian bonds of B. W. Alexander to which Montieth was a surety,) stand upon a different footing. It is said that the administrator had no notice of these debts until 1866. It is uncertain whether this means that he did not know that Montieth was a surety for B. W. Alexander, or that he did not know that a breach of the bond had·been committed. As he did not advertise for creditors, we are bound to assume that he had notice of the liability, and perhaps also we would be bound to assume that he had notice of the breach of the bond, if one had been committed. It does not appear, however, when Al-

exander committed a *devastavit* as guardian. He was solvent until after 1865, and his indebtedness was not discovered until 1866, when a demand was made, and he failed to account and pay. It might be a difficult question, supposing a *devastavit* or misappropriation of the ward's funds to have taken place before 1863, whether it would be a breach of the bond, within the reason of the question we are considering, until his failure to pay, after a lawful demand. But we are under no necessity to consider that, because there is no allegation of any breach before 1866. It is well settled, that if an intestate owe simple contract debts which are due, and be also indebted by a contingent security, such as a bond to save harmless, or other bond under which it depends upon a contingency whether any debt will ever arise, and no breach of the condition has taken place, the administrator may pay the simple contract debts. 2 Williams Executors, 920; *Delamoth* v. *Lanier*, 2 C. L. R., 413; *Collins* v. *Crouch*, 13 Q. B , 542.

VIII. *Judgment quando.*

It was agreed in the argument, that on one of the debts now sued on, the plaintiff had taken judgment *quando*, against the administrator. Probably that fact appears somewhere in the voluminous and unconnected record in this case. It was properly admitted by Mr. Bailey, that such a judgment amounts to an admission that the administrator has no assets at its date. The orders of reference are general, to take an account of the administration of the estate of Montieth, without confining the account to the assets received by the administrator since the date of the judgment *quando*, as it should regularly have been. If the order was entered in its present form by mistake and inadvertence, as the case is still pending in the Court in which the order was made, (the appeal to this Court being essentially interlocutory,) it is within the power of that Court to amend it. We need say nothing more on this point.

In concluding this opinion, we feel bound to say that we have seldom seen a record worse made up. It is unnecessarily

WHITLEY, Guardian, *et al. v.* ALEXANDER, Adm'r., *et al.*

voluminous, full of repititions, the statements are vague, and want of precision both as to facts and dates. There are no marginal references, to aid us in examining it.

PER CURIAM     The case is remanded to be proceeded in, &c. Each party will pay the costs of his appeal.