C. L. HARDY AND COMPANY, BANK OF FARMVILLE, FARMERS GUANO COMPANY, NEW BERN COTTON OIL AND FERTILIZER COMPANY, AYDEN LOAN AND INSURANCE COMPANY, POLLARD AUTO COMPANY, AND PINETOPS BANKING COMPANY, CREDITORS OF THE ESTATE OF T. J. WORTHINGTON, IN BEHALF OF AND TO THE USE OF THEMSELVES AND ALL OTHER CREDITORS OF THE ESTATE OF T. J. WORTHINGTON, v. J. R. TURNAGE, ADMINISTRATOR C. T. A. OF THE ESTATE OF T. J. WORTHINGTON AND NEW AMSTERDAM CASUALTY COMPANY, AND J. R. TURNAGE, ADMINISTRATOR OF THE ESTATE OF T. J. WORTHINGTON, v. S. J. WORTHINGTON, J. V. WORTHINGTON, H. T. WORTHINGTON, STAMEY WORTHINGTON, MARY MARGARET WORTHINGTON AND MRS. LENA V. WORTHINGTON, WIDOW.

(Filed 19 April, 1933.)

1. **Executors and Administrators C c — Pending caveat proceedings, executor may operate property, or apply to court or clerk for such authority.**

Where a caveat is filed to a will the executor is required by statute to suspend all operations relating to the settlement of the estate and to preserve the property until a decision of the issue is had, C. S., 4161, and in the observance of the mandate to preserve the property the executor may operate and manage the property in the exercise of that degree

of care, diligence and honesty which he would exercise in the management of his own property, or he may institute a civil action in which all persons having an interest are made parties and request the court in its equity jurisdiction to authorize such operation, or he may apply to the clerk in his probate jurisdiction for such authorization.

**2. Clerks of Court C c—Clerk has probate jurisdiction to hear and determine petition by executor for power to operate estate.**

Although the clerks of the Superior courts have no equity jurisdiction, they are given probate jurisdiction, C. S., 925, and in the exercise of their probate jurisdiction they may hear and rule on a petition of an executor for authorization to operate the estate's farms to preserve the property pending the determination of caveat proceedings.

**3. Executors and Administrators C h—Executor held not personally liable for loss sustained in operation of farm under clerk's order.**

Where an executor of an estate consisting mainly of farm lands has applied to the clerk for authority to operate the farms pending the determination of caveat proceedings filed in the cause, and has obtained an order therefor approved by the judge of the Superior Court, and has operated the farms through tenants as was the testator's custom, making the necessary advancements to them, and has exercised due diligence and good faith therein, neither the executor nor his bondsman may be held liable to the estate or its creditors for loss occasioned in such operation, such loss being paid out of the cash assets of the estate, nor can they be held liable for expenses incurred in marketing the crop or the purchase of equipment used in the cultivation of the farms, or for personal property of the estate used therefor, and all such items having been paid out of the assets of the estate, the principle that an executor has no authority to create a posthumous debt has no application.

APPEAL by defendants, J. R. Turnage, administrator, and New Amsterdam Casualty Company, surety, from *Cranmer, J.,* at May Term, 1932, of PITT.

T. J. Worthington died in Pitt County on 28 September, 1928, leaving a paper-writing purporting to be a last will and testament, naming his wife executrix thereof. She declined to qualify and on 6 October, 1928, a caveat was filed to the will. Thereafter, on 9 October, 1928, J. R. Turnage was duly appointed administrator of the estate and gave bond in the sum of $60,000 with the defendant, New Amsterdam Casualty Company, as surety. The administrator received from the proceeds of life insurance and other cash items the sum of approximately $28,248.80, together with certain other personal property. Claims were filed aggregating the sum of $47,304.27. At the time of his death the testator left certain farms, containing 974 acres, four houses and lots and two vacant lots in the town of Ayden. He also left eighteen mules and a large quantity of farming implements of various types. The testator had been largely engaged in farming and his farms were in a high state of cultivation and operated largely on a share cropper basis.

On 22 November, 1929, the administrator filed a petition with the clerk of the Superior Court setting out in substance that a caveat had been filed to the will and that the cause could not be heard for sometime. Whereupon the administrator requested an order permitting him to operate the farms for the year 1929, according to the methods theretofore used by the testator. He further requested that the court permit him to make advances to such tenants as could not furnish themselves and to purchase such additional farming implements and teams as might be reasonably necessary for the proper cultivation of the farms. The clerk, after hearing the petition, found "that it would be for the best interest of said estate to permit said administrator to rent the real estate privately, and on shares, and furnish the tenants as had been customary in that community, as may appear to said administrator to be to the best advantage of said estate." Thereupon the clerk made an order allowing the administrator to cultivate the land for the years 1929 and 1930, and to make advances to tenants and purchase such equipment and teams as he found necessary to properly cultivate the land. The order so made by the clerk was duly approved by the resident judge of the fifth judicial district. Pursuant to the order the administrator called in the tenants and authorized them to proceed with cultivating the land and assured them that reasonable advances would be made to those who were unable to furnish themselves.

The year 1929 was a bad crop year and the administrator lost $11,270.35 in the farming operation. Similar orders were made for the year 1930, and the operations for this period showed a profit of $224.22. In December, 1930, the administrator called a meeting of creditors and the widow and heirs at law. The administrator announced at the meeting that all the personal assets of the estate except $663.69 had been expended. The creditors demanded that the estate be closed, and thereupon on 5 December, 1930, the administrator instituted a special proceeding to sell land to make assets. In this proceeding the widow and heirs at law filed an answer denying the right of the administrator to sell lands until the personal estate properly applied, should prove insufficient. The proceeding was then transferred to the civil issue docket, and on 17 March, 1931, certain creditors instituted a suit against the administrator and his surety, seeking to recover the losses incurred by the administrator in operating the farm, claiming that such operation constituted *a devastavit*. The suits were consolidated and referred to Honorable D. H. Bland, referee. The referee heard the evidence and filed a comprehensive report dealing with all phases of the administration. He found that the tillable land was sufficient to maintain a thirty-horse crop, although no more than twenty-five teams were worked thereon, and that the widow and heirs at law knew of the operation of

the farms and consented thereto. He further found with reference to the administration: "There is no suggestion of bad faith on his part in the evidence. However, your referee cannot escape the conclusion that authority to carry on the business of a decedent is a matter that calls for the exercise of the general equity jurisdiction with all interested parties before the court. The clerk has no equity jurisdiction except such as is expressly prescribed by statute. Your referee is unable to find any statute authorizing the clerk to make such orders."

The referee held that the administrator was liable personally for losses sustained in operating the farm during the year 1929, amounting to $11,270.35. Exceptions were filed by both parties and were heard by the trial judge, who was of the opinion that the administrator was liable personally for the following items, to wit: (1) loss in operating the farm for the year 1929, $11,270.35; (2) amounts expended for new equipment, teams, etc., $2,096.92; (3) value of personal property consisting of mules, household and kitchen furniture, etc., amounting to $4,346.49. The actual value of this property was not fixed and it was ordered that this value be determined by a jury, and that the administrator be charged with such value so fixed.

From the judgment so rendered the administrator and his bondsman appealed.

*W. A. Lucas and Albion Dunn for plaintiffs.*
*F. G. James & Son and L. I. Moore for Turnage, administrator, and New Amsterdam Casualty Insurance Company.*

BROGDEN, J. When Worthington died in September, 1928, and the defendant qualified as administrator in the following October, what was the status of the estate?

There were two farms in a high state of cultivation, containing 947 acres, apparently provided with a number of tenant houses and a number of tenants actually lived upon the land. There were eighteen mules and a variety of farming equipment. The administrator could not sell the property because a caveat had been filed to the will and C. S., 4161, spoke to him in the cold and rigid words of a public statute and said: "Suspend all further proceedings in relation to the estate except the preservation of the property and the collection of debts and the payment of all taxes and debts that are a lien upon the property of decedent as may be allowed by order of the clerk of the Superior Court until a decision of the issue is had." Thus "preservation of the property . . . until a decision of the issue is had" was the mandate of the law. Was the land to be "preserved" by abandoning it to the swift erosion of wind and weather pending the uncertain outcome of litiga-

tion? Were the mules to starve or become worthless for lack of care and feeding? Was the farm equipment to be exposed to depreciation and loss?

In discharging the peremptory duty of "preservation . . . until a decision of the issue" three roads were open:

First, the administrator could rely upon the ancient principle long declared and long prevailing that an administrator or executor is required to exercise that degree of care, diligence and honesty which a prudent and faithful man would use in the management of his own property, and while so acting, losses to the estate, however grievous, impose no personal liability. The books are not lacking in concrete illustration of this sound and salutary standard. For example, an administrator can spend money to condition raw materials or commodities so as to make them more salable. *Whitley v. Alexander,* 73 N. C., 444.

Again, he can pay out money to keep in force a life insurance policy securing a note due the estate, although the estate suffers a loss thereby. *Overman v. Lanier,* 157 N. C., 544, 73 S. E., 192. In this case the Court said: "It is true that this turned out a loss to the estate. But it is found that the administrator acted in good faith, and it cannot be held that a reasonably prudent man would have acted differently under the circumstances. It has been forcibly said by some one that 'Our hindsights are better than our foresights.'" Also, where a "debtor to an estate, being in failing circumstances, the administrator made a further advance in money to him and took a mortgage to secure the entire amount . . . and the debtor became utterly insolvent, and the mortgaged property was insufficient to pay the entire debt: *Held,* that the administrator was not liable to the estate for the loss." *Torrence v. Davidson,* 92 N. C., 437, third headnote. In *Davis v. Davis,* 184 N. C., 108, 113 S. E., 613, the administrator "instead of proceeding to settle the estate, continued the business of his intestate and engaged in farming, merchandising, running sawmills and cottongins." In that case the referee found that the administrator was chargeable with $1,809.50 for feeding mules. Upon exception the judge decreed that as the administrator "had acted conscientiously and honestly, at considerable sacrifice of his personal interest and without gain to himself, and that the estate benefited by his administration, doth find and adjudge that the defendants are not liable to the plaintiffs." Upon appeal to the Supreme Court the point was made that the trial judge had overruled the referee with respect to the item of feeding, and the Court said: "No specific allusion is made to this item in the administration account of $1,809.50 for feeding the mules, and there is no finding, and certainly no adequate statement of the facts to sustain the judgment, or to enable us properly to consider and pass upon it." The opinion of the Supreme Court

concludes as follows: "The judgment will be set aside, which will leave the report of the referee before the court for its further consideration, but with special reference to the item of $1,809.50 for feeding the mules, about which the judge may adopt the referee's findings of fact, and his conclusion of law in favor of the plaintiffs, or he may reverse or modify the same and find the facts himself, or take such other action as may conform to the course and practice of the court." It is significant that no point was made of the right of the administrator to continue the business, and the Court expressly recognizes the right of an administrator to feed and care for livestock under proper circumstances.

Second, the administrator might have instituted a civil action in the Superior Court bringing in all creditors, resident and nonresident, if any, and requested a duly constituted court of equity to permit him to feed the livestock and take care of the farm or preserve the property "until a decision of the issue is had." The delay incident to such a proceeding would have been fatal. Certainly, the mules would have been dead before a court of equity could have acted according to the usual course and practice. No tenants would have been available even if the permission had been granted because at that season of the year it was essential for men to know promptly whether they were going to make a crop or not.

Third, he could have applied by petition to the clerk of the Superior Court and invoked the probate jurisdiction of the court, which is direct and summary.

The administrator chose to follow the third road. On 22 November, 1928, he filed a petition for permission to rent the land for the year 1929 in accordance with the method and custom theretofore employed by the testator. After hearing the petition the authority was granted and the order so made was approved by the proper judge of the Superior Court. Acting upon such authority, the administrator proceeded to cultivate the land and to use the stock and to purchase other tools and equipment necessary for the careful and prudent prosecution of the undertaking. He called a meeting of all the tenants and laid his plan before them, informing them that he desired a tenant who could do so, to furnish himself, and as an aid to that end, he would release the tenant's portion of the crop, but could not release the estate's portion of such crops. The supplies furnished were purchased from a corporation of which the administrator was president and the referee finds as a fact "that the amount charged at this store, whether as advances to tenants or supplies for the farm, was the price generally prevailing in the community, the evidence showing no instance of excessive charge, and said administrator directed that upon settlement a discount of five per cent be allowed, which was done." The referee further found that

"due to the excessive rains which began in May and continued with only slight interruptions for a period of about six weeks, practically all crops were a failure. A number of farmers of this locality were examined at the hearing before your referee and without exception, testified that the farming operations for this year resulted in a loss to them." It was further found that the loss resulting from cultivating the land and feeding the stock for the year 1929, amounted to $11,270.35, and the judgments of both the referee and the trial judge imposed this loss upon the administrator personally. Similar orders and decrees were secured by the administrator for operating the farms during the year 1930, but despite depression and unfavorable crop conditions, such operations resulted in a profit of $224.22. It is also significant that creditors find no fault with this operation and the said profit is actually turned into the estate as an asset.

This loss is imposed upon the administrator personally upon the theory that the orders of the clerk, approved by the proper Superior Court judge, were wholly void. The major reasons given for such conclusion are: First, that an administrator cannot create a posthumous debt, enforcible against the estate of decedent. This is a well established principle, but has no application to this case. The administrator did not undertake to borrow money or create a debt to carry on the operation, but used the funds belonging to the estate for such purpose.

Second, that the clerk of the Superior Court has no equitable jurisdiction.

This principle is also well established and conceded. However, the clerk of the Superior Court, under the law, has an original and independent jurisdiction in matters of administration, whether such be called equitable, legal or otherwise. Mordecai in his Law Lectures, Volume 2, page 1190, says: "That the clerk in the exercise of his probate jurisdiction is an independent tribunal of original jurisdiction is settled." Furthermore, in *Pegram v. Armstrong,* 82 N. C., 328, this Court said: "The probate court confessedly had jurisdiction of the suit of a creditor to compel an administrator to account, and to direct the application of the assets to the debts of the estate, and clearly had jurisdiction of the matters in this action." Of course, the Superior Court has concurrent jurisdiction, and such was expressly recognized and applied in the case of *In re Estate of Wright,* 200 N. C., 620, 158 S. E., 192. While the office of probate judge, which was formerly set up in the Constitution of 1868, Article IV, sections 16 and 17, has been abolished, the jurisdiction of the probate court, as a separate entity, has been retained. Thus C. S., 925, declares that "the duties heretofore pertaining to clerks of the Superior Court as judges of probate shall be performed by the clerks of the Superior Court as clerks of said court," etc. The performance of

a judicial act necessarily implies a court with both jurisdiction and discretion to hear and rule.

There is an item of $2,096.92 classified by the referee as group 6. These items consisted of expenses incurred in marketing the crop of 1928, and the price of certain mules and equipment purchased by the administrator for cultivating the farm in 1929 in accordance with the orders heretofore referred to. The trial judge charged the administrator personally with the payment of these items. However, for the reasons heretofore set out in this opinion, this ruling was erroneous.

There is also an item of $4,046.49, covering the value of certain personal property which the administrator received, a portion of which, at least, was used by the administrator in cultivating the farms. If the administrator had the right to use any of the personal property in prosecuting the farming operations under orders of the probate court, certainly he cannot be chargeable with the value of such property so used.

There is no proof that the administrator failed to exercise good faith or ordinary business prudence in prosecuting the farming operations or in using livestock and farming equipment for such purpose. Manifestly the administrator engaged in such undertaking at his peril and at the peril of his bondsman; but when it is established that such acts were not only done in the exercise of good faith, but in the further exercise of ordinary business prudence, and in addition, in conformity with an order of the probate court, approved by the proper judge of the Superior Court, it cannot be held that he incurred personal liability arising from losses sustained through the vicissitudes of the seasons and the uncertainties of the weather.

Reversed.