## P̧ULLIAM *v.* PULLIAM, Ex'r, and others.

*(Circuit Court, W. D. Tennessee.* February 12, 1881.)

1. PRACTICE—REHEARING—INTERLOCUTORY DECREE.

A petition for rehearing is not necessary where there has been only an interlocutory decree ordering an account; nor is it irregular to consider at the hearing, on exceptions to the master's report, all questions determined in the former decree.

2. SAME—BILL BY LEGATEE FOR AN ACCOUNTING.

A specific legatee, filing a bill for a general account of the administration, is not confined to the particular errors alleged in the bill, as she might be if she were surcharging and falsifying a stated account.

3. EXECUTOR—LIABLE FOR LOSS BY DEPRECIATION IN PRICE FROM DELAY OF SALE—EXTENT OF LIABILITY.

An executor who delays for 14 and 20 months to sell cotton of the estate, for no other reason than a belief that it will advance in price, will be held for all losses by depreciation in price, although he may have dealt with his own cotton in the same way. He thereby becomes liable absolutely for the value of the cotton at the time he should have sold it, and will not be credited with a loss incurred by the failure of his factor, although the factor at the time was of good credit.

4. SAME—LIABLE FOR INTEREST ON SPECIFIC LEGACIES.

Specific legacies bear interest from the death of the testator. Therefore, where certain notes belonging to a wife before her marriage were bequeathed specifically to her by the husband's will, and certain other property was also given to her specifically, she is entitled to interest although the property was used by the executor for the payment of debts which would have been lawful if there had been a deficiency of other assets.

5. SAME—PRINCIPLES OF EQUITY GOVERNING THE LIABILITY OF EXECUTOR FOR INTEREST.

Upon an examination of the cases, the principles upon which a court of equity will charge an executor with interest on balances found against him are stated to be: (1) Where he keeps in his hands moneys which it is his duty to invest or pay to the persons entitled, he will be chargeable with interest when he makes interest, or is presumed to have done so, because he has used the fund for himself, or mingled it with his own funds, or kept it idle during an unnecessary delay in settling his accounts. (2) He will not be chargeable with interest on the theory of a *quasi* criminal penalty for a breach of trust. (3) The presumption that he has made interest does not arise where no funds, as a fact, come into his hands, or were immediately paid out in good faith for a purpose erroneously supposed to be lawful. (4) What is to be deemed an unnecessary retention of funds is a question of fact, depending upon the circumstances of each case; but the court will not act on mere inferences, and the balances retained must be to a considerable or substantial amount compared with the whole estate. *Held, therefore,* where the executor was charged by the master with losses on sales of cotton incurred by his negligent delay in selling it, and for money paid to a creditor after the claim was barred by the special statute of limitations in favor of decedent's estates, that he was not, on the facts of the case, chargeable with interest on these sums. *Held, also,* that he was not chargeable with interest on a small balance of $500 used by him in paying his own debts, the estate amounting to as much as $30,000, and it appearing that

he had waived all compensation. *Held, also,* that interest will not be charged from the filing of the bill, but only from confirmation of master's report, unless the executor was liable for it in the first instance.

6. EXECUTOR DE FACTO—EXTENT OF LIABILITY—AS AGENT AND ATTORNEY.

A person named as executor in the will, who refuses to qualify and renounces the trust, but who becomes the *de facto* executor and assumes the whole management of the estate, will be liable, *as executor,* for assets actually received by him, but not for losses incurred by his negligence for which the lawful executor is liable; and this, although he received the assets as the agent and attorney of the lawful executor in cases where he has not delivered them over to him. He is liable also as *agent* and *attorney.*

7. SAME—AN EXPRESS TRUSTEE OF AN IMPLIED TRUST—CANNOT HOLD ADVERSELY WITHOUT NOTICE.

The common statute of limitation of six years is not a defence to a bill in equity seeking an account and satisfaction by a legatee against such person. He is, in that case, an express trustee, the trust being implied from the contract of agency, and not against the contract upon the evidence. This distinction explained. Nor can such a trustee denude himself of his trust and hold adversely, without notice to the *cestui que trust.*

8. ESTATES OF DECEASED—APPROPRIATION OF ASSETS—CREDITOR HOLDING DEBT BARRED BY STATUTE, AN EXPRESS TRUSTEE.

A creditor of the testator, holding a debt barred by the special statute of limitations in favor of decedent's estates, cannot receive or appropriate assets to the payment of his debt so barred, without becoming liable to the executor and legatee in equity for the money so wrongfully paid to himself, and he must refund it, with interest; nor is he protected by the common statute of limitations from the time of the appropriation, being an express trustee, under the circumstances above stated, until the *cestui que trust* has been notified.

9. SAME—A STATE STATUTE LIMITING TIME FOR PRESENTATION OF CLAIMS A RULE OF PROPERTY AS TO TRUSTS, AND IS BINDING ON FEDERAL COURTS SITTING IN EQUITY.

A statute of Tennessee, which provides that unless a creditor shall, within two or three years, as the case may be, present his claim to the executor or bring suit thereon, it shall be forever barred and the executor liable to account for any payment made, is not only a statute of limitations, but a rule of property relating to trusts, which the legislature of the state alone can make, and as such it is binding on the federal courts sitting in equity.

10. WILL—REAL ESTATE—LEGACY CHARGE ON LAND.

If a will exonerates a specific legacy by charging the debts upon all the estate, real and personal, the land is not liable to the specific legatee unless, on a deficiency of personal assets, the specific legacy has gone to pay debts.

11. WILL—HUSBAND AND WIFE—POST-NUPTIAL BOND—SATISFACTION.

A specific legacy, given to a wife by a will, is a satisfaction of a post-nuptial bond for like amount, unless the intention clearly appear to the contrary.

12. BILL FOR ACCOUNT AND SATISFACTION OF LEGACY—FORMAL PARTIES—JURISDICTION.

Where a citizen of another state, being a specific legatee, filed a bill against the executor and residuary legatees for an account and satisfaction of her legacy, *held,* that the court had no jurisdiction to decree an account and relief in favor of residuary legatees, citizens of the same state with the executor, who had filed no cross-bill, and were only defendants for the purpose of ascertaining the rights of the plaintiff.

In Equity.

See the former opinion delivered in this cause, *ante*, 23, for the facts.

*Wright, Folkes & Wright*, for complainant.

*Calvin F. Vance, H. C. Moorman, Harris & Turley*, and *C. C. Harris*, for defendants.

HAMMOND, D. J. This cause comes again before me on exceptions to the report of the special master, John B. Clough, Esq., and on a petition for rehearing as to the question of the money paid to Joel L. Pulliam after the bar of the statute in favor of dead men's estates.

I find it unnecessary to determine whether a petition for rehearing can be heard at this stage of the cause. The former decree was only interlocutory, for an account, and on final hearing all questions are open. *Fourniquet* v. *Perkins*, 16 How. 82.

### LOSSES ON COTTON.

The executor excepts to the master's charge of $6,750.35, losses on cotton belonging to the estate. I cannot do better than to appropriate, as the opinion of the court, the report of the master on this subject, it is so thorough and to my mind so conclusive an exposition of the facts as shown by the proof and the law as I find it after a careful examination of the authorities.

Nor do I think the fact that there are no specified allegations in the bill in regard to this cotton alters the case. It is not like a bill to surcharge and falsify a stated account, or to reopen a settlement. It is for an account of this administration *de novo*, and the plaintiff is in no sense bound by the settlement in the county court of which she had no notice, either actual or constructive. As a mere question of evidence, the settlement in the county court is *prima facie* taken in favor of the executor, but it is not binding on the plaintiff, as it might have been, perhaps, if she had been present or notified. Besides, the proof shows that this executor himself did not know the facts about this cotton, and how could the plaintiff? They were disclosed only by the searching investigation necessary in taking this account before the master. I am satisfied this is not a case for the application of the rule so much relied on, that we must be confined to the bill and issues made by it in taking the accounts. In *Badger* v. *Badger*, 2 Cliff. 137, it is distinctly stated that "he had given public notice to all persons interested," and *Lupton* v. *Janney*, 13 Pet. 381, was placed by the court "wholly upon the ground of lapse of

time," and the meaning of this is apparent when compared with the report in 5 Cranch, 474. The supreme court says, in *Perkins* v. *Hart*, 11 Wheat. 237, that, even at law, a settled account is only *prima facie* evidence of its correctness, and concludes nothing as to items not stated in it. *Hager* v. *Thompson*, 1 Black, 80–93; *Piatt* v. *Vattier*, 9 Pet. 405; *Stevens* v. *Page*, 7 How. 819; *Chappedelaine* v. *Dechenaux*, 4 Cranch, 306; *Lidderdale* v. *Robinson*, 2 Brock. 159; *Pratt* v. *Northam*, 5 Mason, 95.

These cases show that when acquiescence, lapse of time, and the statute of limitations are relied on, and it is shown that a settlement has been made of which the parties had notice, and it is sought to be reopened by bill charging fraud, mistake, or the like, the court requires strict pleading, alleging the fraud and omissions, and explaining why they were not set up at the time of the hearing. But these rules cannot apply to a case like this, where no final settlement has been had, except one that is *ex parte*, the effect of which is prescribed by statute and well understood not to preclude an accounting *de novo* in a court of equity, if any errors have been shown, even in the state courts. It is said that the rule which binds a party to an account to which he does not except, presupposes proper notice. *Carr* v. *Lowe*, 7 Heisk. 84; *Jameson* v. *Shelby*, 2 Humph. 198, 200, which was not a bill for a general account, but only to correct one item; *State* v. *Hyde*, 4 Bax. 464.

The master says, in reference to this cotton:

"After a very careful examination of all the proof, I find and report that John N. Pulliam, in the year 1864, raised a crop of cotton on his home place, in Fayette county, and in the year 1865 he raised a crop of cotton on the Isbell place, in said county. Of this 1864 crop a portion had been hauled to Memphis and disposed of before the death of John N. Pulliam, and the balance was stored in two cabins on the Isbell place. On November 16, 1865, this cotton, amounting to 22 bales, was shipped by the executor at La Grange, Tennessee, by rail to George W. Trotter, a merchant at Memphis, Tennessee, and was received by him on the eighteenth day of the same month, and stored in the cotton-shed of Rambaut & Lamb, where it remained until Trotter's failure, when the executor took charge of it and placed it in the hands of Owen McNutt & Co., on May 7, 1867. Said firm, on June 24, 1867, sold nine bales of this cotton at 24 cents a pound, netting $906.83; on June 28th following they sold 12 bales at 21 cents a pound, netting $992.98; and on July 17th following the remaining bale at 17 cents a pound, netting $67.97—making in all the sum of $1,967.78, the amount with which the executor charges himself.

"I also find and report that the amount of cotton raised on the Isbell place in 1865, and belonging to the estate, was 38 bales. None of this cotton was ginned or sold at the time of John N. Pulliam's death; but it was all picked,

taken to the home place, some one and three-fourths miles distant, ginned, and hauled back to the Isbell place, and stored before the executor's sale, January 19, 1866, there being no gin on the Isbell place. On March 9, 1867, this cotton was sold by Trotter at 20 cents a pound, netting $2,573.56, the return of sale being dated May 1, 1867. Said George W. Trotter failed about this time, and these 38 bales of cotton became a total loss to the estate, as reported by the executor, except the first dividend of $86.04.

"It is claimed by the complainant that the executor should have sold this cotton promptly; that he had no right to hold any of it for a period of from 15 to 18 months on a falling market; and that he is, therefore, answerable for the entire loss. The executor, on the other hand, claims that he acted in good faith, and that, therefore, he is not to be made answerable for these losses.

"I find and report that from the qualification of the executor, December 6, 1865, there was an almost constant decrease in the price of cotton down to the time when this cotton was actually sold. I further find that the executor and his attorney, Joel L. Pulliam, treated their own cotton, some 80 to 90 bales, in the same manner as the executor treated the cotton of the estate, recovering from Trotter their own at the same time that the said 22 bales belonging to the estate were recovered from him. The executor, in his settlement with the county court, claims that the 38 bales of cotton, so sold as above stated by Trotter, were shipped and appropriated by him without instructions, and no proof has been adduced to contradict this.

"The Code of Tennessee, § 2243, provides that the executor shall sell the personalty *at public sale*, pointing out the mode. But in *Johnson* v. *Kay*, 8 Humph. 142, it was held that he might sell ' at private sale or otherwise, and in doing so, generally speaking, he will incur no liability beyond accounting for their value;' and in *Hunter* v. *Bryant*, 12 Wheat. 32, the supreme court of the United States decided that an ' executor, who takes charge of the affairs of a man in trade, must necessarily, in the winding up of his affairs, be allowed a reasonable discretion.' *Smith* v. *Smith*, 4 Johns. Ch. 282; *Bradshaw* v. *Cruise*, 4 Heisk. 260; *Thompson* v. *Brown*, 4 Johns. Ch. 619. In his life-time John N. Pulliam sold his cotton through said Trotter, as his cotton merchant, and Memphis was then a market for Fayette county cotton.

"Assuming there was no *mala fides* in the executor holding this cotton, and that it was held in the best of faith for an anticipated rise, just as he held his own, still I do not think he had a right, as executor, to hold it for such a purpose, though the anticipated advance would have been solely for the benefit of the estate. In *King* v. *Talbot*, 40 N. Y. (Hand,) 76, it is said by the supreme court of New York 'that the just and true rule is that the trustee is bound to employ such diligence and prudence in the care and management as, in general, prudent men of discretion and intelligence *in such matters* employ in their own like affairs.' This necessarily excludes all speculation, all investments for an uncertain and doubtful rise in the market, and, of course, everything that does not take into view the nature and object of the trust. *Hemphill* v. *Lewis*, 7 Bush, 214; *Phillips* v. *Phillips*, 2 Frem. 12; *Taylor* v. *Tabrum*, 7 Sim. 12; *Braser* v. *Clark*, 5 Pick. 96; 6 Mod. 181; 1 Bouv. Dict. ' Devastavit,'

4, 5; *Thompson* v. *Brown*, 4 Johns. Ch. 629–630; 4 Kent, Com. 551, and note *b*, *et seq.*

"The 22 bales of the 1864 crop of cotton were shipped to Memphis, November 16, 1865, and the crop of 1865, being 38 bales, was ginned and baled ready for market before the sale of the personal property, January 19, 1866, and I think, and so report, that all this cotton should have been sold promptly, at or about that time, under all the circumstances surrounding this case, and that the conduct of the executor in holding it as he did, for so long a time and on a declining market, and with so large an indebtedness against the estate drawing interest, was not such an exercise of diligence and prudence, *in trust matters,* as would excuse him from the loss thereby resulting. From the deposition of Thomas H. Allen I find that the price of such cotton as this, during the months of January and February, 1866, was 38 cents a pound. Had the executor promptly sold the 60 bales of cotton he would have realized for it $6,730.35 more than he did; his delay causing a loss to the estate of that amount."

I do not find anything in the cases cited by the learned counsel for the defendants to militate against these conclusions of the master. It is, undoubtedly, often said that the measure of prudence for a trustee is that degree used by an ordinarily prudent man in the conduct of his own affairs. But *non constat,* because a trustee, by the same conduct, loses his own property, that it was a prudent exercise of his trust. Hill, one of the defendants in this case, says he sold his cotton in Somerville, near where all these parties lived, and the estate cotton was kept, for 50 cents per pound, and Allen's testimony is conclusive that it was worth all the master has charged the executor. And yet, keeping it for a higher price for so long a time, the executor sold it for 17 and 20 cents a pound. It does not seem to me, under the facts disclosed, a prudent thing for a man to have kept his own cotton for 15 or 20 months on a falling market, upon any theory that ultimately it would advance. The close of the war threw an accumulated quantity upon the market, and opened an opportunity for unobstructed production, and it was mere speculation to suppose that the emancipation of the slaves would so decrease production as to enhance the price. A man may take such risks with his own, but if he embark the property of others in such a doubtful and dangerous sea of speculation, he must answer for the consequences. The proof shows they held their own cotton, but they lost none of it by Trotter's failure, and how this happened is unexplained.

As to the executor, it is plain that he turned the management over to his brother, Joel L. Pulliam, who, while renouncing the trust imposed by the father's will, became *de facto* the executor, thereby

evading responsibility otherwise attaching to him. But the executor is none the less liable for his acts. I cannot resist the impression made by the whole case that this *de facto* executor conducted the affairs with peculiar selfishness, and in utter disregard of the rights of the plaintiff, and that the responsible executor allowed this to be done. Joel L. Pulliam is dead, and many things are unexplained which probably he could explain; but the burden is on the defendants to show that they did all that could have been done to save this estate from loss. The liability of the executor does not grow out of any imprudent selection of Trotter as the factor: on this ground, probably, he would not on the proof be liable; but out of the long delay in selling the cotton, whereby the executor became absolutely liable for its value without reference to his subsequent conduct in its sale.

Under our statutes of administration two years and a half, and at most three years, are allowed an executor or administrator to finally wind up an estate. Of course many contingencies may protract this term, but it indicates that 15 or 20 months cannot be safely allowed to pass without selling a commodity like cotton, so readily commanding the highest cash prices, and at the same time so fluctuating in value that it has become the chief article of speculative gambling in market values. It would subject estates to irretrievable ruin to allow this element of speculation to enter into their management. I do not hold that executors are to be liable for every delay nor every loss by any delay, but only that unreasonable delay, prompted by no other motive than speculation for a higher price, cannot be indulged, and that 15 or 20 months' delay on a constantly-declining market is unreasonable.

The statutes requiring a public sale are only directory, and although in some states it is thought necessary to especially authorize sales of such commodities by factors, I am of impression that without such statutes an executor may sell in that mode without incurring any risk of loss by depreciation, or by failure of the factor or purchaser, if he acts with ordinary circumspection and prudence, and within a reasonable time. Neither is the test of this prudence to be found in any factitious differences of price which might have been obtained by selling in one mode or at one time, rather than in another; for, in all affairs of men, such matters must depend on sound discretion. But there are limits to the conduct of executors and trustees, and within these limits they must be kept, and in this case the defendants acted beyond all reason in holding the cotton.

I shall not undertake to distinguish cases, but only cite those I

have examined, including all cited in argument, and am content to rest my judgment on the principles enunciated in those most favorable to the executor. *Lockhart* v. *Horn*, 1 Woods, 628; S. C. 17 Wall. 570; *McKenzie* v. *Anderson*, 2 Woods, 359; *Ex parte Jones*, 4 Cranch, 185; *Green* v. *Hanberry*, 2 Brock. 403; *Ventress* v. *Smith*, 10 Pet. 161; *Head* v. *Starke*, Chase, Dec. 312; *Johnson* v. *Kay*, 8 Humph. 142; *Bradshaw* v. *Cruise*, 4 Heisk. 260, 263; *McCaleb* v. *Perry*, 5 Hayw. 88; *Mickel* v. *Brown*, 4 Bax. 468; *Rockhold* v. *Blevins*, 6 Bax. 117; *Deberry* v. *Ivey*, 2 Jones, Eq. 370; *Tyrrell* v. *Morris*, 1 Dev. & Bat. Eq. 559; *Wynns* v. *Alexander*, 2 Dev. & Bat. Eq. 58; *Cannon* v. *Jenkins*, 1 Dev. Eq. 426; *Williams* v. *Maitland*, 1 Ired. Eq. 92; *Whitley* v. *Alexander*, 73 N. C. 444; *Bryan* v. *Milligan*, 2 Hill, Ch. 361; *Mikell* v. *Mikell*, 2 Rich. Eq. 220; *Teague* v. *Deady*, 1 McCord, 456; *Lamb* v. *Lamb*, Speers, Eq. 289; *Webb* v. *Bellinger*, 2 Dess. Eq. 482; *Hext* v. *Porcher*, 1 Strob. Eq. 170; *Boggs* v. *Adger*, 4 Rich. Eq. 412; *Clary* v. *Sanders*, 43 Ala. 287; *Harris* v. *Parker*, 41 Ala. 604; *McRae* v. *McRae*, 3 Bradf. 200, 206; *Schultz* v. *Pulver*, 3 Paige, 182; *Re Butler*, 38 N. Y. 397, 400; *Thompson* v. *Brown*, 4 Johns. Ch. 619; *Pierson* v. *Thompson*, 1 Edw. Ch. 212; *Litchfield* v. *White*, 7 N. Y. 438; *Hasbrouck* v. *Hasbrouck*, 27 N. Y. 182; *Mead* v. *Byington*, 10 Vt. 116, 121; *Munteith* v. *Rahn*, 14 Wis. 227; *Neff's Appeal*, 57 Pa. 91; *Sanford* v. *Thorp*, 45 Conn. 241.

### INTEREST ON THE LEGACIES.

Schedule C of the report shows the property specifically bequeathed to the plaintiff, including the notes and interest on them collected of the debtors, to have been $12,430.32. The interest on this from the death of the testator to the filing of the master's report, at 6 per cent., is $8,051.06, making the amount due the plaintiff, principal and interest, $20,481.38. That specific legacies bear interest from the date of testator's death is settled. Roper, Legacies, (2d Am. Ed.) 1250; 2 Williams, Ex'rs, (4th Am. Ed.) 1221; *Sullivan* v. *Winthrop*, 1 Sumn. 1; *Darden* v. *Orgain*, 5 Cold. 211; *German* v. *German*, 7 Cold. 180; *Mills* v. *Mills*, 3 Head. 706; *Jones* v. *Ward*, 10 Yerg. 161; *Harrison* v. *Henderson*, 7 Heisk. 315, 348.

### INTEREST AGAINST THE EXECUTOR.

The master has not in fact in the account charged the executor with interest on any item found against him, but the report and the proof show that, deducting the value of the lands, the executor is

charged with a balance in his hands, or that should have been in his hands on the theory of the report, amounting to $16,538.45. If interest were charged on this sum from the date of the executor's settlement in the county court to the date of the master's report at 6 per cent., the usual rate in this state, it would be $7,905.37, making altogether, without the lands, $24,443.82,—sufficient to pay the plaintiff and leave a surplus for the residuary legatees of $3,962.44; and if interest were charged only from the filing of the bill to the date of the master's report, it would be $3,969.23, making altogether, without the lands, $20,507.68,—sufficient to pay the plaintiff and leave a balance of $26.30.

Analyzing this principal sum of $16,538.45 charged against the executor it will be found partly made up of the $9,246.02 paid to his brother, Joel L. Pulliam, or, as the proof shows, collected on the notes given in the will to the plaintiff by Joel L. Pulliam himself in his capacity of attorney for the executor, and by him retained, with the consent of the executor, and applied to the payment of his claims against the testator before that time barred by the statute of limitations in favor of dead men's estates. It never actually came into the hands of the executor. He was not a trustee for investment; he never used it as his own, or mingled it with his own funds, or made any interest or profit with it in trade or otherwise; neither did he keep it idle, nor refuse to account for it. He carried it into his accounts, and by his vouchers showed what had become of it when he settled with the county court. He paid it on a debt already determined in this case to have been valid, except that it was barred as presented too late under the statute; but he and the creditor had sought to save this bar by pursuing a statutory mode of saving it, which failed because they did not strictly follow the statute. The payment must, therefore, be held to have been made in good faith and under a mistaken view of his liability to make it.

Another part of the principal sum is the $6,730.35, losses on cotton. It never came into his hands at all, and it is apparent he has never used it or kept it idle or mingled it with his own funds. Briefly, it may be stated that these losess consist of increased value charged against the executor because of delay in selling the cotton, and failure to collect for sales made by Trotter, the commission merchant, who became bankrupt. It cannot be said that there was any concealment about this cotton. The settlement with the county court does not deal with the subject with that fullness and candor that should have been used

on the facts as they are now disclosed, but it does show that the executor claimed that the loss incurred by Trotter's misappropriation should fall on the estate, and not on him. There is enough indicated to give plaintiff, and others interested, notice, so that they could have had that question passed upon by the court, if she had not chosen to resort to some other court for that purpose. The loss by Trotter's misappropriation would probably not have been charged to the executor, as he was a merchant of good standing, if the executor had acted promptly in selling the cotton. The master proceeds upon the theory that there was ample time to have sold and realized before Trotter's failure, and it is because of this delay, and not because of any negligence in selecting Trotter as the factor, that the executor is charged. And it is to this delay that the cause of the loss must be attributed in determining the liability of the executor for interest; for, while on the facts he may be chargeable with the principal sum, it does not follow that he should also be charged with interest.

The balance of said principal sum, amounting to $562.08, did come into the executor's hands as a matter of fact. He used $500.69 in settlement of a debt of his own with Trotter, and collected the remainder, $62.08, in two small dividends from Trotter's bankrupt estate since the settlement in the county court. On these facts is the executor liable for any, and if any, what interest?

The court said in *Granberry* v. *Granberry*, 1 Wash. 246, 249, that "there is no general rule which obliges an executor to pay interest. We find from the cases upon this subject that it has been determined both ways, and upon principle it will appear that no general rule can be found; each case must depend upon its own particular circumstances. In some cases the executor ought, and in others he ought not, to answer interest." There is the greatest difficulty in extracting any principle from the cases upon which the courts may uniformly act. It seems to be very much a matter of discretion with the court in each case to be governed by the peculiar circumstances of that case. *Litton* v. *Litton*, 1 P. Wms. 543; *Tew* v. *Winterton*, 1 Ves. 452; *Morris* v. *Dillingham*, 2 Ves. Sr. 170; *Jones* v. *Ward*, 10 Yerg. 161. This is adverted to in almost all the cases, and necessarily so diversifying them that unless there be nearly an identity of facts there can scarcely be said to be a precedent for any case. Much depends upon the temperament of the judge, and his estimate of the merit or demerit of the special circumstances relied on to excuse the executor, and the particular conduct complained of by the parties. It

is useless to undertake to reconcile cases, and the most that can be done is to examine them for some indication of a common element of decision by which this discretion may be regulated.

An unknown but none the less accurate writer in the Solicitor's Journal has recently given the English cases a critical examination in a very useful article on the subject; and, so far as relates to the points involved in this case, upon an independent investigation I am satisfied with the general correctness of his statements. 11 Cent. Law J. 285, 306, 324, 342. He says:

"The principle on which the court proceeds in such cases has been the subject of considerable controversy, although, however, it has long been settled that a trustee or executor who unnecessarily keeps in his hands moneys which it is his duty to invest or pay to the persons entitled, will be charged with interest. *Atty. Gen.* v. *Alford,* 4 De G., M. & G. 843, 851; *Stacpoole* v. *Stacpoole,* 4 Dow. H. L. Cas. 209, 224; *Blogg* v. *Johnson,* L. R. 2 Ch. 225, 228. The idea that was formerly entertained that the court, in the exercise of a *quasi* criminal jurisdiction, would condemn trustees or executors to pay interest as a penalty for a direct breach of trust, (*Pearse* v. *Green,* 1 J. & W. 135, 140; *Salt-marsh* v. *Barrett,* 29 Beav. 474,) has been disavowed, and the result of recent decisions is to leave the practice of charging interest upon the ground that the trustee or executor either has made or must be taken to have made interest by his use of the trust moneys, constituting moneys in his hands, 'had and received to the use' of the *cestui que trust. Atty. Gen.* v. *Alford, supra; Mayor of Berwick* v. *Murray,* 7 De G., M. & G. 497, 519; *Burdick* v. *Garrick,* L. R. 5 Ch. 233; *Vyse* v. *Foster,* L. R. 8 Ch. 309, 333. The practical effect of the latter view in restricting the liability of the trustee is to charge him with interest or profits only when he might have made them, as is shown in the lastly above-mentioned cases." 11 Cent. Law J. 286.

Again:

"What is to be deemed an unnecessary retention of trust funds, so as to subject a trustee or executor to payment of interest, is a question of fact to be decided on the circumstances of each case."

And he then deduces the rule as to executors, that if, without necessity to meet growing claims against the estate, they keep the money uninvested merely for the purpose of using it, the court will charge them with interest. *Holgate* v. *Haworth,* 17 Beav. 259, 260; *Forbes* v. *Ross,* 2 Cox, 115.

Again:

"Interest is only charged on funds which the executor or trustee has actually retained. If he has lost the trust fund through neglect in calling it in, the court will not charge him with interest. *Tebbs* v. *Carpenter,* 1 Madd. 290; *Lowson* v. *Copeland,* 2 Bro. C. C. 156."

But see *Re Pilling*, L. R. 8 Ch. 711, where a trustee was charged with loss and interest on wine left with the debtor. And—

"If an executor, acting *bona fide*, pays money to the wrong person by mistake, the court, although requiring him to make it good, will not, it seems, make him restore it with interest. *Saltmarsh* v. *Barrett*, 29 Beav. 474; *Bruere* v. *Pemberton*, 12 Ves. 386." 11 Cent. Law J. 287.

And—

"It requires clear and distinct evidence that there was a balance in their hands before the courts will charge an executor with interest on balances. It will not act upon a mere probability in reference to it. *Davenport* v. *Stafford*, 14 Beav. 319, 333. Moreover, it appears that, in order to give a claim for interest against executors, there must be a clear case of improper retention of balances to a considerable or substantial amount. *Jones* v. *Morrall*, 2 Sim. (N. S.) 252; *Davenport* v. *Stafford, supra; Longmore* v. *Broon*, 7 Ves. 124; *Melland* v. *Gray*, 2 Coll. 295." 11 Cent. Law J. 306.

Other authorities support these positions. Ram, Assets, 512, (6 Law Library, 338;) Fonb. Eq. Book, 2, *c.* 7, § 6, note *p;* 2 Williams, Ex'rs, (4th Am. Ed.) 1567, and notes; Toll. Ex'rs, 480; 2 Daniell, Ch. Pr. (5th Am. Ed.) 1370, and notes; Bisph. Eq. § 142; 2 Lomax, Ex'rs, 556; *Tew* v. *Winterton*, 1 Ves. 451, Sumner's notes; *Newton* v. *Bennet,* 1 Bro. C. C. 359, (Perkins' Ed. and notes;) 2 Story, Eq. Pr. § 1277; 1 Perry, Trusts, §§ 468, 472; *Atty. Gen.* v. *Solly*, 2 Sim. 518, (2 Eng Ch. Rep. Am. Ed. and notes;) and they find abundant support in the general current of American cases cited in *Turney* v. *Williams*, 7 Yerg. 171, in that case itself, and many others; *Hook* v. *Payne*, 14 Wall. 252; *Taylor* v. *Bentram*, 5 How. 233, 275; *Dexter* v. *Arnold*, 3 Mason, 284, 290; S. C. 5 Mason, 303, 316; *Union Bank* v. *Smith*, 4 Cranch, 509; *Gratton* v. *Appleton*, 3 Story, 755; *Norman* v. *Storer*, 1 Blatchf. 593; *McKenzie* v. *Anderson*, 2 Woods, 357.

The Tennessee cases show that here, as elsewhere, while the general rule is well understood to be that of the leading case of *Turney* v. *Williams*, 7 Yerg. 171, where it is said that interest is not charged against executors as a matter of course, but only where they make interest or profits as a fact, or are presumed to have done so,—as where the executor uses the money for himself, or keeps it idle during an unnecessary delay in settling his accounts,—there has not been, by any means, a uniform application of it; and this want of uniformity has so involved the rule that it is quite impossible to reconcile the cases. Perhaps, in the nature of the case, uniformity of application is itself impossible. In that case the executor enjoyed the

money for his own use, and by false accounts having exhibited the estate as insolvent, he was charged with interest. In *Jones* v. *Ward*, 10 Yerg. 161, the executor paid improvident expenses of the legatee while at college to save him from disgrace, and the court charged him with interest. So in *Torbett* v. *McReynolds*, 4 Humph. 214, where administrators neglected to sue for a slave, they were charged with its value and interest. In *Jameson* v. *Shelby*, 2 Humph. 198, the executor, in good faith, converted bank stock, and he was charged with interest on its value. In *Deaderick* v. *Cantrell*, 10 Yerg. 263, an executor charged with a trust to invest was made to pay simple interest on yearly balances for a breach of that trust. In *Lowy* v. *McGee*, 3 Head, 269, an executor, also a trustee for investment, having failed to collect a debt and employ it in the most useful manner for the benefit of the *cestui que trust*, was charged with the lost debt and interest from the time of the loss. In the case of *Governor* v. *McEwen*, 5 Humph. 240, trustees, not executors, were charged with interest because they neglected to invest as required by their trust. But in *Wood* v. *Cooper*, 2 Heisk. 441, an agent, acting in good faith, was not charged with interest unless he actually received it. In *Laura Jane* v. *Hagen*, 10 Humph. 331, a testator emancipated a young slave and provided that she should have $200 a year for her education. Her mother removed her to Ohio, and, her freedom being denied, the money was never paid. The court allowed her the principal sum, but as "interest in such a case is not a matter of positive law, and whether it shall be allowed or recovered must depend on the circumstances of each case," it was refused, because for several years her residence was unknown to the administrator, and no proper application had been made until the bill was filed; it was allowed, however, from the filing of the bill. In *Fulton* v. *Davidson*, 3 Heisk. 614, 637, the will appointed executors, but required no duty except that they should pay debts, or at least they were not trustees for investment. Fulton, one of the executors, received all the money, (and it was a wealthy estate,) and at the time he was killed in the confederate army the balance on hand was unpaid and unaccounted for, and he was held responsible for so much as had not been applied to the payment of debts. It does not appear what he did with the funds, but as the controversy was largely made to hold a solvent joint executor liable, it is inferred that the funds were at least endangered by his inability to pay them promptly after the war through his representatives, although the circumstances satisfied the court that he acted with

fidelity and integrity. The court states the rule as to interest to be that "he has the right to continue to hold the residue of the funds for the purpose of paying other debts, and that he could not be chargeable with interest unless it should be shown affirmatively that he converted it to his own use, or that he made interest upon it, or that he failed through negligence to apply it in payment of debts." He was not charged with interest. In *Harrison* v. *Henderson*, 7 Heisk. 315, the question of interest was not discussed, but the executors, under circumstances showing fraud upon the legatees in the collusive sale of a tract of land for less than its value, which one of them who had resigned bought, and immediately resold for $1,000 profit, were charged with the price of the land, with interest, and the $1,000 profit, I infer, without interest; they were also charged with "all the assets received or that might have been received with proper diligence," but, I infer, without interest, except as to the land above mentioned. In *Morris* v. *Morris*, 9 Heisk. 815, the war prevented the administrator from collecting the assets, but he was charged after the close of the war with all debts lost to the estate through the fault of the administrator in not exercising a reasonable diligence in their collection, but interest was refused. In *German* v. *German*, 7 Cold. 180, the executor had a balance of $353.80, out of a fund disbursed amounting to over $3,000, and the court reversed the chancellor, who charged him with interest, on the ground that he might retain it to pay reasonable expenses of administration. In *Williford* v. *Watson*, 14 Heisk. 476, no question of interest arose, but the court refused to charge the loss of the fund, by the breaking of a bank, on the administrator, although he retained it after the time for distribution arrived, because the distributees had not tendered refunding bonds under the Code.

Of these cases *Jones* v. *Ward* and *Torbett* v. *McReynolds*, and perhaps others, are very strongly against the executor in this case, and would probably justify us in charging him with interest on this whole sum. But I think they are exceptional cases, outside the current of authority in Tennessee and elsewhere, and they have not been, so far as I can find, followed in their harsh application of the rule of interest against executors. They are neither of them, strictly speaking, precedents for this case; and, acting on the conceded principle that each case is governed by its own circumstances, there are such essential differences of fact that I am of opinion that even a court, authoritatively bound by them, would not apply them to a case like this. There is one consideration of this subject which seems to me

controlling in all cases. While the court should sedulously guard the beneficiaries against all wrongful conduct of the executor, and not allow him to take any benefit beyond a reasonable compensation fixed by the court, either directly or indirectly, he should not be so harshly dealt with by imposing penalties of interest where none is made, or could by any possible assumption of facts be presumed to have been made, as to deter prudent and responsible men from taking these trusts.

All men are sometimes more or less negligent in their own as well as other people's affairs, and to visit these penalties upon them is calculated to drive the administration of estates into the hands of irresponsible men. I find this principle running through the cases, and it does seem to me enough to hold this executor liable for the principal sum lost by his negligence, without charging him with interest which it is obvious he has not made, as a fact, nor could have made under the circumstances.

On the small balance used in the payment of his debt to Trotter, and that collected since his settlement, he might be charged with interest; but it is inconsiderable in amount, and as he has asked for no compensation, and will receive none, I shall treat those sums as too small to notice in a case of this magnitude.

Whether he should be charged with interest since the filing of the bill is another question, and I find it as perplexing as the one just considered. Generally, I do not find that the cases make any distinction between a liability for interest before and after bill filed. Indeed, it is said to be a general rule that where an executor is not chargeable with interest he will not be chargeable even with costs, on the theory that the suit is necessary to liquidate his accounts and ascertain his liability. *Newton* v. *Bennett,* 1 Bro. C. C. 359, (Perkins' Ed. and notes;) 2 Williams, Ex'rs, (4th Am. Ed.) 1752; *Seers* v. *Hind,* 1 Ves. 294. Interest, except by contract, is almost purely statutory, and even at law is not allowed except as a measure of damages discretionary with the jury. As a general rule, a court of equity does not allow interest on unliquidated demands; but when the demand has been liquidated by the report of a master, or by a decree, it is usual to allow it from that time. *Ryckman* v. *Parkins,* 5 Paige, 543. In *Mowry* v. *Whitney,* 14 Wall. 620, 653, this principle is applied in a patent case and interest allowed, not from the filing of the bill, but from the final decree, because the profits sued for were really only damages for infringement of plaintiff's rights, and were unliquidated. The court, however, carefully reserves the right

of a court of equity to allow interest in a proper case. In *Hunn* v. *Norton*, 1 Hopk. Ch. 392, it was ruled that interest should be allowed from the date of the report. In *Turner* v. *Burkinshaw*, L. R. 2 Ch. 488, it was allowed from the date of the report, and the principles are stated which change the rule in cases of fraud and concealment, as in *Hardwicke* v. *Vernon*, 14 Ves. 504. In *Blogg* v. *Johnson*, L. R. 2 Ch. 225, it is said a mere omission to account does not invoke this rule, and interest was charged only from the date of the report. In *Gallivan* v. *Evans*, 1 Ball. & B. 191, an administrator *pendente lite* was not charged with interest pending the suit, although he had the fund in hand. In *Dawson* v. *Massy*, Id. 230, it was laid down as the rule, in cases where he was chargeable with interest, that it should commence from the time when the executor could show no cause for retaining a balance in his hands. In *People* v. *New York, etc.*, 5 Cow. 331, and *Sivett* v. *Hooper*, 62 Me. 54, it is said that wherever a debtor knows what he is to pay, and when he is to pay it, he shall be charged with interest if he neglects to pay; and no demand is necessary. And in *Pope* v. *Barrett*, 1 Mason, 117, the rule is stated that interest is generally due from suits brought in cases where it is necessary to make demand before putting the party in default for non-payment. *Williams* v. *Baxter*, 3 McL. 471; *Hunt* v. *Nevers*, 15 Pick. 500; *Rishton* v. *Grissell*, L. R. 10 Eq. 393. In *Gratton* v. *Appleton*, 3 Story, 755, an agent was not charged with interest pending the suit where he made none, and was entitled to the judgment of the court whether he should pay. And so it was in *Wade* v. *Wade's Adm'r*, 1 Wash. 475, where interest was waived on that account; and in *Norman* v. *Storer*, 1 Blatchf. 593, the executor was charged only from the date of the deposit. *Stearns* v. *Brown*, 1 Pick. 530, seems to hold that an executor is liable for interest after proceedings commenced only when he makes it. But in *Flintham's Appeal*, 11 S. & R. 16, he was charged from the time of filing his reports in the court below, where he *admitted* a balance; while in *Hoopes* v. *Brinton*, 8 Watts, 73, it was held he was liable only from date of confirmation, and should not be chargeable pending exceptions to the report. In *Laura Jane* v. *Hagan*, 10 Humph. 331; *Sparhawk* v. *Buell*, 9 Vt. 41, 81; *Brinkley* v. *Willis*, 22 Ark. 1; *Scrivener* v. *Scrivener*, 1 H. & J. (Md.) 743, (which I have not seen,) interest was allowed from the filing of the bill. *Pickering* v. *Stamford*, 4 Bro. C. C. 160, note *e;* S. C. 2 Ves., 581, 586.

The rule to be gathered from the cases, I think, is this: Where an executor is, upon principle, liable for interest, he will be charged

from the time he should have paid the money, from its receipt, or from the date of conversion, according to circumstances; but will sometimes be excused, where the other side is in fault, until demand made or bill filed. If, however, he is, on principle, not chargeable with interest, it will not be reckoned against him until, by a decree confirming the report, his accounts have been settled and the amount he is to pay ascertained.

I feel constrained, therefore, to hold, that, notwithstanding I believe from the facts of this case the executor here has deserted his trust by turning it over to his brother, in whose sole interest he seems to be acting even now by taking his part in this litigation, and that they both have persistently determined to so conduct this administration that the plaintiff should be defeated of her legacy, actuated, no doubt, by a belief that she got more of their father's money than she should have had, he is not, in strict law, liable to pay interest, for the reason that he has made no profit, and has funds to pay her now only because he is to be charged with money saved by the statute of limitations on the one hand and an increase over actual results on the other. To charge him with more than the principal sum would be inflicting a penalty rather on sentimental grounds, than giving compensation for injury actually received. The principal sum, for which the executor is liable, is $16,538.45, and for this the plaintiff is clearly entitled to a personal decree against him.

### LIABILITY OF JOEL L. PULLIAM.

In the opinion given at the hearing I indicated that Joel L. Pulliam was not liable to the plaintiff for the $9,246.02 paid to him by the executor after the bar of the statute of limitations in favor of dead men's estates. The executor was not then, nor is he now, seeking any recovery of this sum, and I do not consider whether he could recover it. And this is one of the strongest features of this case, and shows how entirely this executor has submitted himself to the domination of his brother's interest as against his own. Ordinarily, as soon as it appeared that an executor was sought to be charged with a wrongful payment to a supposed creditor, he would take steps to recover the money back for the benefit of those to whom it belonged; but, so far as it appears here, this executor has not done this, certainly neither by cross-bill nor otherwise in this case, but on the contrary stands jointly with his brother, and, by the same counsel, insists that he is not liable for it, at least not to the plaintiff. Perhaps this may be

explained by the suggestion made in the record that he is protected by refunding bonds, or by stipulation or agreement to hold him harmless; but, if this be so, it only shows how willing he is to manage his trust in the interest of his brother and against this plaintiff. It is the exhibition of a partiality foreign to the duty of any trustee, no matter how he may feel justified in it.

I have come to the conclusion that whether the executor chooses to act or not, whether he is content to admit the non-liability of his brother's estate or not, the plaintiff can enforce whatever rights the executor has against his brother, and be substituted to them. This question, therefore, is to be considered not only with reference to the rights of the plaintiff as against Joel L. Pulliam's executors, but also to those of the executor of J. N. Pulliam against them. "It is undoubtedly," says Chief Justice Marshall, "the course of the court to decree in the first instance against the party who is ultimately responsible; but this is only done where the parties are before the court at the time of the decree, and their several liabilities are clearly ascertained." *Garnet* v. *Macon,* 2 Brock. 185, 225. This money paid to the brother was in every sense the plaintiff's money. The notes on which it was collected were hers before her marriage with the testator; the will gave them to her specifically; and in order that her ownership and enjoyment of the legacy should be complete, the will of the testator charged the debts on all the other property, real and personal, in exoneration of that legacy.

Joel L. Pulliam, while renouncing the appointment, became, in fact, the real executor, and managed the whole business to that extent, as shown by the proof, that J. J. Pulliam was only nominally the representative of the estate, and, the former being an experienced and able lawyer, the nominal executor the more readily trusted everything to him. These notes so specifically given to the plaintiff were placed in his hands or came into his hands by reason of this relation, and in his capacity as attorney he sued for and collected them. Being a creditor of his father's estate, he applied the money to the payment of his debt after the statutes which protect dead men's estates had operated to forbid the payment. It seemed to me at the hearing that the plaintiff's only remedy was against the executor; that there was no privity between her and Joel L. Pulliam; and that in analogy to the ordinary statute of limitations money paid on a barred debt could not be recovered. But here the creditor was not simply a creditor receiving payment of his debt; he was more than this. He had been named in the will as executor, and, while not such

in name, he was such *de facto;* he was an attorney, an agent; he was a residuary legatee; he was a son, brother, and step-son; and the facts in this case show that his was the executive mind and he the controlling force in the management of this estate. Now, I do not think he can divest himself of all these relations to the parties and stand in the shoes of a mere creditor. His rights are the same, undoubtedly; but the money was in his hands, not as a creditor, but as agent and attorney, and he cannot, without being a creditor in fact, retain it. He must be held to account as agent and trustee, unless he has shown that his appropriation of the money was rightful and lawful. His claim being barred, he could not excuse his liability to account to this executor, or to the plaintiff whose money he had in his hands as agent and attorney, by showing that he had applied it to the payment of a barred debt. And in this view the defence set up for him, of the statute of limitations, cannot avail him. He was, prior to the settlement, holding the money in his capacity of agent and attorney, in subordination to the rights of all the parties, and not until the settlement did that relation change so that his possession became adverse either to the executor or this plaintiff. The bill was, therefore, filed in time to save any bar. Nor is this trustee character in any sense implied, so that it would be brought under the operation of the statute. He was the agent and attorney by contract, and the fact that he was also a creditor made him none the less so.

Indeed, on the facts of this case, he might, I think, be held as principal executor. A person named as executor, who renounces, will be liable, nevertheless, in equity as executor for such assets as he actually receives. 2 Williams, Ex'rs, (4th Am. Ed.) 1555, 1556; *Lowry* v. *Fulton,* 9 Sim. 116; S. C. 16 Eng. Ch. 116.

There are some qualifications to this rule, but on examination they will be found to be isolated transactions, or those where the renouncing executor, having complied with his agency for the executor, is pursued for the latter's default, and not cases like this, where he has appropriated the assets. *Dove* v. *Everard,* 1 Russ. & Mylne, 231. And it was decided by the supreme court of the United States that one dealing with an executor, knowing the facts, who possesses himself of the assets, can be made to refund them in a court of equity, and the assets may be followed for that purpose. *Smith* v. *Ayer,* 101 U. S. 320; 2 Williams, Ex'rs, (4th Am. Ed.) 800, 801; *Tyrrell* v. *Morris,* 1 Dev. & Bat. Eq. 559, and note to 2d Ed. by Battle.

Now, whether one charged as executor, notwithstanding his renunciation, is an express or implied trustee, in view of the statute of lim-

itations, I think would depend on the circumstances of the case; and, aside from the fact that he is named executor in the will, the circumstances might still charge him as the one or the other. The supreme court of the state in *Haynie* v. *Hall*, 5 Humph. 289, says the statute applies in all that class of trusts that become such by matter of evidence as where a party takes possession in his own right, and is turned into a trustee by implication of law; or, as the case of *Wheeler* v. *Piper*, 3 Jones, Eq. 249, expresses it, where he is trustee "against the agreement" of the parties. But in express or direct trusts created by contract of the parties the statute of limitations does not operate. In such cases the trustee takes possession and holds for another. His possession is the possession of that other, and there can be no adverse holding until the trustee denudes himself of his trust by assuming to hold for himself and notifies the *cestui que trust* of his treachery. But, says the same learned court in *Marr* v. *Chester*, 1 Swan, 416, 418, "when a trust is implied from the contract of the parties, the *cestui que trust* is as much protected from the operation of the statute of limitations as if the trust had been declared by an express undertaking;" and this furnishes a criterion by which nearly all the cases can be reconciled. *Graham* v. *Nelson*, 5 Humph. 604; *Guthrie* v. *Owen*, 10 Yerg. 339; *Smart* v. *Waterhouse*, Id. 93; *McDonald* v. *McDonald*, 8 Yerg. 145; *Lafferty* v. *Turley*, 3 Sneed, 157; *Moffatt* v. *Buchanan*, 11 Humph. 369; *Carr* v. *Lowe*, 7 Heisk. 84, 98; *Loyd* v. *Currin*, 3 Humph. 462; *Harris* v. *Carney*, 10 Humph. 349; *Robertson* v. *Auld*, 6 Yerg. 406; *Chaney* v. *Moore*, 1 Cold. 48; Ang. Lim. §§ 166, 168, 468. If there were nothing in this case except a creditor receiving of the executor payment of his debt after the bar had attached, I should unhesitatingly hold that the creditor would be protected by the statute, because he would be turned into a trustee by implication upon evidence against the agreement of the parties.

But where he is named as executor in the will, and, although renouncing, takes upon himself the administration, so that as to assets actually received he is liable under the doctrine already mentioned, he becomes, in my judgment, as much an express trustee as if he had duly qualified. But he was by contract the agent and attorney of the executor, and, knowing all the facts and the plaintiff's rights in the premises, he received her notes in that capacity, collected her money in that capacity, and became, by necessary implication upon that contract, her trustee and the trustee of the executor, and the case falls directly within the principle so positively stated and so well illustrated in *Marr* v. *Chester, supra*. The fact that there

were other trusts attaching to the fund, such as the trust for the benefit of creditors, to which it may be the trust in her favor was subordinate, does not change this result; nor does the fact that he claimed to be himself a creditor, whether upon a debt already barred or not, alter the case. "A trustee, having possession of the trust estate for his *cestui que trust*, cannot, by any act of his own, without communicating with the *cestui que trust*, so change the character of his possession as to make it adverse." *Armstrong* v. *Campbell*, 3 Yerg. 200, 236, (Cooper's Ed.) And, in the language of *Taylor* v. *Walker*, 7 Heisk. 734, 740, "it is not shown in the proof that he disrobed himself of the character of trustee by giving complainants notice of his adverse holding;" at least, not till the settlement with the county court, and from that time the statute does not apply. See table of dates attached to the master's report, where it appears that while more than six years had elapsed from the appropriation of the money by the agent and attorney, to the filing of the bill, it was less than that time from the date of the settlement in the county court, which was made by him, and was the first intimation plaintiff had that he claimed it as his own.

The statute of limitations out of the way, Joel L. Pulliam would, therefore, be liable for the money to either the plaintiff or the executor on either of the grounds above mentioned; and on the first possibly he would be liable even for the losses on the cotton, incurred, as the proof shows, by his mismanagement. But I do not find the cases carrying the doctrine further than to charge a renouncing executor for assets actually received by him. I do not rest my judgment wholly on this ground, conclusive as it is to my mind, and am prepared to hold, (although no case has been cited in argument, and I have found none,) upon principle, that an executor or administrator may recover back from a pretended creditor any money paid to him, and that a creditor with a valid claim, which has been allowed to lapse by failure to present it or sue upon it, as required by the above-quoted sections of the Code, must pay back any money he receives upon it. He will be held to be a trustee, in a court of equity, upon principles already enunciated, and that because his debt no longer exists any more than if he had never had any claim at all.

Ordinarily, money paid under a mistake of law cannot be recovered back, while if paid under a mistake of fact, without negligence, it may. Bisph. Eq. §§ 184, 195; *Elliott* v. *Swartwout*, 10 Pet. 137; *Hunt* v. *Rousmanier*, 8 Wheat. 174; *Bank of U. S.* v. *Daniel*, 12 Pet. 32; *Railroad* v. *Soutter*, 13 Wall. 517. But courts of equity afford

relief where additional circumstances constitute sufficient grounds for interposition, and always where there is encouragement, misrepresentation, or ignorance taken advantage of by the party receiving the payment. Bisph. Eq. § 188. Whether the facts here would be held to show a mistake of law as to the legal effect of the supposed request for delay, or of facts as to the existence of a valid request, would be a nice question if it were necessary to decide it. But, on all the above authorities, an agent or attorney employed to manage his client's affairs, who, whether by ignorance or design, leads that client to suppose that, as a matter of law, he can safely make a payment to himself, cannot relieve himself from liability to refund on the ground that there has been a voluntary payment made under a mutual mistake of law.

The executor here had a right to a correct judgment from Joel L. Pulliam on that question, and he cannot protect himself against an erroneous judgment on such a ground. In *Lupton* v. *Lupton*, 2 Johns. Ch. 626, it was ruled that a legatee receiving more than his share must refund in favor of others. *David* v. *Frowd*, 1 Myl. & K. 200; *Williams* v. *Gibbes*, 17 How. 239, 255; 2 Williams, Ex'rs, 1244; *Orr* v. *Kaines*, 2 Ves. Sr. 194. It was ruled in *Johnson* v. *Moseby*, (MSS. opinion, Knoxville, Sept. 1880,) 1 South. Law J. (N. S.) 802, that a creditor who, without an indemnity bond, received more than his share, could not upon subsequent insolvency, at the instance of other creditors, be compelled to refund the excess over his *pro rata;* while in *Ewing* v. *Morey*, 3 Lea. 381, where, in insolvency proceedings, a creditor received more than his share, he was held to be a trustee as to the excess for the others. But in these cases there was a valid and subsisting claim; here there was no valid claim, but, on the contrary, one that was extinguished. The distinction is obvious. Nor need I consider the question whether the debt was really extinguished or remained so far obligatory that it would support a payment. There is undoubtedly a principle (and it was that misled me at the former hearing) that a debt barred by the statute of limitations or discharged in bankruptcy, will, nevertheless, support a payment, or a new promise to pay, after the bar has attached or the discharge has taken effect. But this must be confined to the ordinary statute of limitations, and cannot be said of the statutes in favor of dead men's estates. As to a new promise to pay, the executor or administrator cannot make a valid one after the bar of these statutes has attached, and it is settled that he cannot waive this statute, while he may the ordinary statute of limitations. *Batson* v.

*Murrell,* 10 Humph. 301; *Brown* v. *Porter,* 7 Humph. 373; *Byrn* v. *Fleming,* 3 Head, 658; *Wharton* v. *Marberry,* 3 Sneed, 603; *Wooldridge* v. *Page,* 9 Bax. 325; *Woodfin* v. *Anderson,* 2 Tenn. Ch. 331.

Now, if the executor cannot waive this statute, or make a new promise, how can it be said that an actual payment may be made. Or, rather, if the creditor could not sue upon and maintain a new promise to pay, how can he support an actual payment? It is conceded the executor is liable, because there is no obligation on him to pay, and he cannot do it without a breach of trust. No more can the creditor legally receive it. In the case of the ordinary statute the debtor may pay, or promise to pay, and even an executor may do it and the law protect both. But if the doctrine contended for by the defendants is sound in this case, the man who pays must lose, while he who receives may gain by retaining that which belongs to another; if it is wrong to pay, it is wrong to receive. Nor do I think it depends, even in the case of the ordinary statute of limitations, upon any distinction as to whether the effect of the statute is to extinguish the debt or only bar the remedy. Whether the particular statute does one or the other is a question of construction; whether the Tennessee statute does the one or the other need not be determined here. A discharge in bankruptcy effectually extinguishes a debt, and yet it will support a new promise, or an actual payment; because while a man lives there is a moral obligation on him to pay his debts, whether the legal obligation be extinguished or only barred, and in that sense the debt is never extinguished. But *non constat* that this is so when a man is dead; that moral obligation perishes with him, and survives neither to his executor nor his heir as a matter of law, though he may, by will, confer it on them. Anciently his property went to the first taker, or was absorbed by the church for pious uses; but the law-making power interfered, and by statute imposed on his property a trust for the benefit of his creditors. In this view the proceedings to recover the debt are, in a large sense, proceedings *in rem* against the property. It has never been denied that the legislature may attach such conditions as it chooses to this trust.

These statutes attach a condition precedent that the creditor must proceed within two or three years, as the case may be, to enforce his claim. If he does not, the heir or legatee takes the property absolutely discharged of all further trust for the benefit of the creditors, and may follow it into whosesoever hands it goes. It does not matter that the person in possession once had a trust upon it; if that trust no longer exists he cannot keep it.

These statutes, for the protection of dead men's estates, may fall under the generic term of statutes of limitation, but they are also something more as rules of property, and their effect is not necessarily the same as the ordinary statute of that name.

I have already pointed out some distinctions. There are others. The state is bound by these, but is not by the ordinary statutes of limitation, and for the reason that they are rules of property as well as statutes of limitation. *State* v. *Crutcher*, 2 Swan, 514; *Chestnutt* v. *McBride*, 1 Heisk. 389, 394. This is not answered by the suggestion that the creditor may go into another state and collect his debt, which shows it is not extinguished. If the rules of property there be such that his claim is a trust on assets in that state, undoubtedly our laws do not operate to defeat him there, but here they do; and as to assets in Tennessee, he has, when barred, no claim or trust for his debt, and he cannot acquire any by an act of the executor, which is a breach of trust as to those who now solely own the assets, namely: the legatees, and here, the plaintiff, as to this specific legacy. There is nothing in *Puckett* v. *James*, 2 Humph. 564, to sustain a contrary view. In that case the debt was not barred, and the court says distinctly if it had been the ruling would have been different.

### ARE THESE STATUTES BINDING ON THE FEDERAL COURTS?

It has been earnestly argued that these statutes, "being statutes of limitation, are not binding in suits in equity in this court." I do not understand this formula to be anything more than an assertion of the familiar principle that courts of equity are not bound by statutes of limitation as such, and that they proceed, independently of these statutes, upon grounds of their own; sometimes enforcing them as binding because there is a concurrent remedy at law to which they apply, wherefore a court of equity recognizes them; and sometimes using them as analogies in the application of their own rules of decision relating to stale demands and lapse of time. If state statutes have prescribed for their equity courts a different rule of conduct, or state decisions have bound the state equity courts to enforce these statutes (as is sometimes said) as laws binding on courts of equity as well as courts of law, such statutes or decisions are not binding on us here.

To this I readily accede, and, when qualified by the statement that when a federal court of equity does enforce a statute of limitations, either concurrently with a court of law or by analogy, it enforces the

statutes of the state, and not the statutes of England, and draws its analogies from the same, I have no doubt it is a correct statement of the law. But this only refers to these statutes as affecting *remedies,* and not to such as become rules of property. Our Code, § 2763, for example, enacts that seven years' adverse possession vests a good and indefeasible title to land; and such a construction of the common statute as that of *Kegler* v. *Miles,* M. & Y. 425, makes these statutes, in some cases, *rules of property* as well as statutes of limitation, and as such courts of equity enforce them in all cases, legal and equitable; and, so far as they are rules of property, they are binding on the federal courts of equity, and should be. It would be intolerable if they were not. The result in cases like this, if that were not the rule, would be that one creditor would have a trust on assets for his debt, while another would have none; or the same creditor in one court would have a right to satisfaction out of assets, and in another he would not.

There are, as said in argument, some instances in other departments of the law where similar results grow out of conflict of decision between the state and federal courts; but it is agreed everywhere that such consequences should be avoided, if possible, and I do not care to add the administration of estates to the catalogue of such misfortunes.

The administration of estates belongs peculiarly to ecclesiastical or probate courts; and courts of equity, while assuming jurisdiction to the extent they do, cannot ignore the positive rules of law regulating such administration, and thereby produce confusion on any theory that they act independently. The original statute of limitation did not, in terms, apply to equitable remedies, and for that reason alone it was not binding on courts of equity administering equitable relief. This was not because equity courts were above statutory authority, for when the court found itself for any reason administering incidentally or concurrently *legal* remedies, it obeyed the statute, and only in its own exclusive sphere did it ever assume to be exempt from it. These special statutes of limitation perform for other departments of the law and courts therein a higher function than that of merely limiting causes of action as to time. They are not supplementary substitutes for the common statutes of limitation, but positive rules of law, acting in an independent field of jurisprudence for a different object. Therefore, I hold that, whether binding as statutes of limitation or not, as rules of property they should govern us.

Here, by the death of the testator and the operation of law and his will, the money in controversy became the property of the plaintiff, charged, however, with a trust in favor of his creditors; but this trust does not now exist, or, if existing, is terminated by non-compliance with these statutes, and the property becomes hers absolutely.

The legislature of the state of Tennessee has the power to regulate these trusts and prescribe these rules; and congress has, on the other hand, no power to make or alter these, or any others, on the subject. While the federal equity courts administer the principles of equity law uniformly, and under the same rules of practice, in all the states, necessarily, in so far as they deal with the administration of estates, this practice must be subordinate to the right the states have to prescribe such rules as we find in these statutes for the protection of decedent's estates. Otherwise, we are inevitably and forever bound to those which we have derived from England, and her laws operate for all time, without any power anywhere to change them.

I should not consider it necessary to make the suggestion but for the fact that the position, taken now for the first time in this case, is supposed to have become the established doctrine in the federal courts. It is, in my opinion, a misapplication of the requirement of uniform practice and the rules governing us in regard to the ordinary statutes of limitation, and finds no support in the authorities. The cases cited for it are: *Union Bank* v. *Jolly*, 18 How. 504; *Payne* v. *Hook*, 7 Wall. 430; *Boyle* v. *Zacharie*, 6 Pet. 648; *U. S.* v. *Howland*, 4 Wheat. 108; *Noonan* v. *Lee*, 2 Black, 500; *Neves* v. *Scott*, 13 How. 270; *Smith* v. *Railroad*, 99 U. S. 398; *Railroad* v. *Whitton*, 13 Wall. 285; *Carter* v. *Treadwell*, 3 Story, 25, 51; *Meade* v. *Beale*, Taney, Dec. 361; *Johnson* v. *Roe*, 10 Cent. Law J. 328; S. C. 1 Fed. Rep. 692; *Hall* v. *Russell*, 3 Sawy. 506. These cases, like many others, are only intended to protect the judicial power of the United States from encroachment by preserving to it the remedies and forms of proceeding which are granted with it, and not at all to set it above the legislative control of the states in matters pertaining to their jurisdiction. The cases cited from the supreme court do not, in my judgment, establish or in the least authorize the doctrine that state statutes, prescribing the time within which a creditor of a decedent must present or sue upon his claim in order to entitle him to share in the assets, and having the effect these do, are not binding on this court. If the other cases cited are intended to establish that doctrine I cannot assent to them.

On the whole case I think Joel L. Pulliam's executors are liable to the

plaintiff for the money he received, and interest on it; but she is not entitled to two satisfactions, and whatever she recovers from them must be credited to the extent of the principal sum of $9,246.02 on her decree against J. J. Pulliam. As to the interest recovered from Joel L. Pulliam, it is interest on her money and belongs to her, and should not go to relieve J. J. Pulliam of any liability to her. Therefore, let the decree provide that out of whatever sums she realizes from Joel L. Pulliam's estate she shall be paid first interest up to the time of settlement with her, any balance to be credited as above directed, so that so much of the principal sum as she recovers of Joel L. Pulliam's estate shall go to exonerate the executor.

## LIABILITY OF THE LAND.

When this case was first before me there appeared to be a deficiency of personal assets and a necessary resort to the land to enforce the trusts of the will; but the investigations before the master have developed the fact that there were sufficient personal assets to pay the plaintiff's legacies, and therefore the land is not liable, and never was. The will does not charge the legacies on the land, but exonerates them from the debts by charging the latter upon the land. *Byrd* v. *Byrd*, 2 Brock. 169; *Garnett* v. *Macon*, 2 Brock. 185; S. C. 6 Call, (Va.) 308; *Stevens* v. *Gregg*, 10 Gill. & J. 143; *Lupton* v. *Lupton*, 2 Johns. Ch. 628; Perry, Trusts, §§ 568, 576; 2 Wms. Ex'rs, (4th Am. Ed.) 1245, and notes. That the interest accumulated since the settlement has carried the legacy beyond the personal assets (if no interest be charged against the executor on these balances against him) cannot affect the case. Residuary legatees are not liable to refund unless in case of an original deficiency of assets. *Walcott* v. *Hall*, 2 Bro. C. C. 305; S. C. 1 P. Wms. 495, note; *Demere* v. *Scranton*, 8 Ga. 43; 2 Wms. Ex'rs, 1245.

There were assets enough to pay the debts, and therefore the land is not to be charged, because, at last, the plaintiff would not recover her legacy from the land, but only so much of the debts as had been necessarily paid with her legacy on account of deficiency of personal assets.

### POST-NUPTIAL BOND.

The plaintiff is not entitled to any relief on account of the post-nuptial bond mentioned in the bill. It was satisfied by the bequests of the will. *Bryant* v. *Hunter*, 2 Wheat. 32; S. C. 3 Wash. 48.

But it is not a practical question in this case, in any view, for the reason that there can be no surplus to pay it.

### RESIDUARY LEGATEES.

The residuary legatees cannot recover anything against the executor in this cause. It is a bill which has no other purpose, and can properly have none other, than to ascertain the amount due the plaintiff and to enforce its payment. *Payne* v. *Hook,* 7 Wall. 425; *Hook* v. *Payne,* 14 Wall. 252; *Haines* v. *Carpenter,* 1 Woods, 262. Whether, under any circumstances, we would have jurisdiction to decree relief to the residuary legatees against the executor, they all being citizens of this state, I need not now inquire. There are no assets for distribution, and they are entitled to no other relief, in my view of the case.

Let the proper decree be drawn, according to the principles laid down in this opinion, in favor of the plaintiff, as prescribed by the eighth equity rule.

NOTE. See *Hall* v. *Law,* 102 U. S. 461, 466, on statutes of limitation in a court of equity.